THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN KRUEGER, Defendant-Appellant.

Second District   No. 2—89—1207

Opinion filed February 21, 1991.—Rehearing denied March 19, 1991.

Donald J. Ramsell, of Ramsell & Associates, of Wheaton, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

The defendant, Kevin Krueger, appeals a trial court order denying his petition to rescind the summary suspension of his driver's license (Ill. Rev. Stat. 1989, ch. 95½, par. 2—118.1). The trial court held that the suspension was valid even though the warrantless arrest of the defendant inside his home, on which the suspension was predicated, violated the defendant's right to be free of unreasonable searches and seizures. On appeal the defendant argues that the summary suspension of his driver's license pursuant to section 11—501.1 of the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.1) may not be predicated on an illegal arrest. We agree and reverse.

On October 8, 1989, the defendant was arrested and charged with

driving under the influence of alcohol (Ill. Rev. Stat. 1989, ch. 95½, pars. 11—501(a)(1), (a)(2)). He received notice that his license would be suspended. On October 19, 1989, the defendant filed a petition to rescind the suspension, and a hearing on the petition was held on November 6, 1989. The trial court denied the petition on that day and, on November 19, 1989, denied the defendant's motion to reconsider the judgment but granted a stay of the suspension pending appeal.

Testimony at the hearing on the defendant's petition to rescind centered on the events of the early morning of October 8, 1989. The defendant resided with his parents and brother at 1009 Riverside Drive in Elmhurst. Mary Dachtera, who resided next door at 1005 Riverside Drive, was awakened at approximately 1 a.m. by noises coming from the area of the Kruegers' home. She heard knocking on the window or door of the Kruegers' house and, looking out her windows, observed three uniformed officers of the Elmhurst police department outside. She went out the back door and started talking to the policemen. One of the officers told Dachtera that the defendant had been in a car accident and that they needed to talk to him. After finding an unlocked door, Dachtera went upstairs and called the defendant's name. She found that the defendant was sound asleep in his bed and, according to her testimony, went downstairs, opened the front door and told the officers that the defendant was upstairs and that she could not wake him up. She also told the officers "[h]e is out of it, but he is fine."

After the officers insisted that they needed to talk to the defendant, Dachtera let them in, and the four proceeded upstairs to the defendant's bedroom. One officer woke up the defendant, and, after the defendant sat up, the officers asked him to get dressed and go downstairs to talk with them. Dachtera went downstairs, and a few minutes later the officers brought the defendant, now dressed, down to the dining room table to talk with him. Dachtera, who had telephoned the defendant's sister, did not hear the questions that the officers asked the defendant.

The defendant's mother, Patricia Krueger, testified that she and her husband had just returned from Florida on the afternoon before their son was arrested and that before going on vacation they had told Mary Dachtera to watch the house. They did not give Dachtera a key to the house or permission to enter the house or to allow others to enter. Mrs. Krueger testified that, slightly before 1 a.m. on October 8, she and her husband talked with their son, who had just come home. They asked him where his car was; he replied not to worry, that a friend had driven him home; they went out to find his car. The

defendant's father, George Krueger, testified that Mary Dachtera had not been given consent to allow any individuals to enter the Kruegers' home and that the Kruegers had not consented to the entry of the police into their home on October 8, 1989.

The defendant testified that he arrived home about a quarter to one on the morning of October 8, having been driven home in his car by a friend whose identity he could not recall. He acknowledged that, before coming home, he had had "a lot to drink," specifically three or four Bacardi and rum mixed drinks. He testified that he talked to his parents, consumed "a couple of [alcoholic] drinks," and went to bed. He did not hear the officers knocking or Mary Dachtera calling. He did not give the police consent to enter his home, was asleep when the officers entered his bedroom, and was never asked by the officers if he minded their being there. The defendant testified that one officer asked him to talk about the accident, that he agreed to do so, and that he told the officer that he had lost his head and panicked. Under a continuing objection by his attorney, the defendant testified further that he told the officer that he had had too much to drink, was drunk, and was sorry. He testified that after this questioning the officers ordered him to dress and come downstairs, that downstairs the officers questioned him some more about the accident, and that they then had him perform some field sobriety tests. The defendant admitted that he fell several times while performing the balance test and the walk-and-turn test and that he did badly on the heel-to-toe test.

Officer Richard A. Lewis of the Elmhurst police department testified that at 12:46 a.m. on October 8, 1989, he received a report of an unknown vehicle striking some mail boxes on the frontage road of Route 83. When he arrived at the accident scene, he observed that the vehicle had left the roadway, struck and flattened a pole that held four mailboxes, and left behind a passenger side T top and other vehicle parts. With the help of other officers, he located the vehicle two blocks away in the parking lot of the Ramada Inn. He ran a check on the license plate and went to the defendant's address. He went to the front porch, knocked on the door and got no answer. A call to the residence by the dispatch system also received no reply. Officer Lewis and two other officers knocked on the back door, and, after Mary Dachtera asked what the problem was, he told her that there had been an accident involving the defendant's car and that he wanted to talk to the defendant about it.

Officer Lewis testified that Mary Dachtera went into the Kruegers' house for a couple of minutes and came back down. According to Lewis, Dachtera told the officers that the defendant was in

his bedroom, that he had vomit on him, that he was unresponsive to her yelling and shaking him, and that he did not wake up. Dachtera opened the door and let the officers inside. Officer Lewis testified that he entered solely to check on the defendant's well-being and was afraid that the defendant may have suffered internal injuries or choked on his own vomit. After seeing the defendant asleep in the bedroom, Officer Lewis checked for the defendant's pulse and breathing and shook the defendant awake. Officer Lewis noted that the defendant's breath smelled strongly of alcohol and that the defendant's eyes were very glassy. He asked the defendant if the latter minded his being there, and the defendant said that he did not care. On the request of the police, the defendant got dressed and went downstairs. Officer Lewis arrested the defendant in the house between 1 and 1:30 a.m. and administered a breath test on the defendant at 2:35 a.m.

Officer Lewis acknowledged that he had received no consent to enter the Kruegers' home. He was aware before entering that Mary Dachtera was a neighbor, not the owner of the house.

Officer Lewis acknowledged that the breathalyzer test he gave the defendant reflected the effect of any alcohol the defendant may have consumed after 12:46 a.m. He acknowledged that the machine could not differentiate between predriving and post-driving alcohol consumption and that if the defendant had had any alcoholic beverages after driving, the machine would not accurately reflect his blood-alcohol content at the time of driving.

The trial judge held initially that the inclusion of the effect of post-driving alcohol consumption in the results of the breathalyzer test did not violate due process. The trial judge then held that the warrantless entry into the defendant's home was illegal. The trial judge found specifically that the police entered without consent, that Mary Dachtera had told the officers that the defendant was asleep but was fine and not, as Officer Lewis had testified, that she had told him that the defendant was unconscious and unresponsive, and that the officers entered not merely to check on the defendant's health but also to investigate the defendant's possible driving under the influence. The trial judge concluded that there were no exigent circumstances to validate the warrantless entry into the defendant's home.

The trial judge also found that the defendant was arrested in his living room after the field sobriety tests, that the defendant had cooperated with the officers' request that he take those tests, and that the officers at the time of arresting the defendant had probable cause to believe that the defendant had been driving while under the influence

of alcohol. The trial judge also concluded that without evidence of the defendant's blood-alcohol test reading, he could not state by a preponderance of the evidence that the extra two drinks that the defendant consumed at home caused the reading to meet or exceed .10 of 1%. The court denied the petition for rescission.

In denying the petition and the subsequent motion to reconsider, the trial judge reasoned that to grant rescission because the arrest of the defendant was illegal would amount to the improper application of the exclusionary rule to a civil proceeding. He explained further that the police did not have probable cause to arrest the defendant until after the warrantless entry into his home, when they were able to view the defendant with vomit on him and to infer that the defendant had driven the vomit-soaked automobile. The trial judge granted a stay of the suspension pending the resolution of this appeal.

On appeal the defendant argues that the summary suspension of his driver's license must be rescinded because he was not lawfully arrested as required by statute. The State replies that the statute requires the trial court find only that the defendant was arrested, that the arresting officer had reasonable grounds to believe that the defendant was driving under the influence of alcohol, and that the defendant either refused a breathalyzer test or took a valid breathalyzer test that produced a result of .10 or more. The State argues that to require that the underlying arrest be valid would amount to the improper imposition of the exclusionary rule in a civil proceeding. The State also argues that, even if the legality of the defendant's arrest is in issue, the trial judge's findings of fact require us to conclude that the arrest was valid. The defendant replies that Illinois' courts have reversed suspensions where the initial arrests were unlawful, that the majority of other jurisdictions that have considered the issue have required a lawful arrest for a summary license suspension, and that the statute itself indicates the legislature's intent to guard the motorist's fourth amendment rights.

The defendant also argues that the trial judge erred in not considering the defendant's post-driving, prearrest consumption of alcohol in evaluating the reliability of the breathalyzer test. Because we hold that the illegal arrest of the defendant requires reversal of the denial of the petition for rescission, we do not reach this issue.

■ Section 2—118.1(b) of the Illinois Vehicle Code provides, insofar as is relevant here:

"The scope of the hearing shall be limited to the issues of:

1. Whether the person was placed under arrest for an offense as defined in Section 11—501, or a similar provision of a

local ordinance, as evidenced by the issuance of a Uniform Traffic Ticket; and

2. Whether the arresting officer had reasonable grounds to believe that such person was driving or in actual physical control of a motor vehicle upon a highway while under the influence of alcohol, other drug, or combination thereof; and
*** 

4. Whether the person, after being advised by the arresting officer that the privilege to operate a motor vehicle would be suspended if the person submits to a chemical test, or tests, and such test discloses an alcohol concentration of 0.10 or more ***." Ill. Rev. Stat. 1989, ch. 95½, par. 2—118.1(b).

We hold that the arrest required by the first paragraph must be a lawful and valid arrest. We believe that this construction is consistent with our duty to ascertain and give effect to the intent of the legislature and to avoid, if possible, a construction which would raise doubts regarding the constitutionality and validity of the statute. *Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 362-63.

The statute does not explicitly require that the initial arrest be lawful. Prior to 1986, the arresting officer was required to state, within his sworn report to the Secretary of State and the circuit court, that tests performed on the motorist had been made pursuant to and following the lawful arrest of the motorist for an offense as defined in section 11—501 of the Illinois Vehicle Code or a similar provision of a local ordinance. (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501.1(c).) The defendant correctly notes that some cases decided under the statute as it was in effect prior to 1986 stated, at least in *dictum*, that a lawful arrest is a prerequisite to a valid summary suspension. (*People v. Hutchinson* (1986), 141 Ill. App. 3d 1086, 1088; *People v. Voigt* (1985), 131 Ill. App. 3d 510, 512.) Although the statute no longer requires the arresting officer to swear that the initial arrest was lawful, we cannot conclude that this amendment reflects a legislative intent to empower the Secretary of State to suspend a motorist's license where the motorist has not been lawfully arrested for driving under the influence. We find compelling reasons to avoid ascribing such an intention to the legislature.

First, as noted above, it is our duty to avoid a construction that would open the constitutionality of the implied-consent law to serious question. Although the State characterizes the issue in this case as whether to apply the exclusionary rule to a civil summary suspension proceeding, we believe that the real question before us is whether the statute affirmatively authorizes the Secretary of State to suspend a

motorist's license on the basis of a search which itself is the product of an unauthorized arrest. The Secretary's power to impose a summary license suspension is derived from the statute, and we decline to read the statute as, in effect, authorizing unconstitutional arrests or searches and the imposition of new deprivations based on those unconstitutional arrests or searches.

■■ ■ A statute or rule that authorizes unconstitutional searches or seizures will be held unconstitutional. (*Holland v. Parker* (D. S.D. 1973), 354 F. Supp. 196, 199; *Hansen v. Illinois Racing Board* (1989), 179 Ill. App. 3d 353.) In *Holland v. Parker*, the Federal district court struck down a South Dakota implied-consent statute that did not limit the suspension power to cases where there had been a lawful arrest, explaining that to authorize blood tests not incident to a valid arrest would negate the motorist's right to be free of unreasonable searches and seizures. (See also *Schutt v. MacDuff* (1954), 205 Misc. 43, ____, 127 N.Y.S.2d 116, 126-28 (implied-consent law held unconstitutional because it authorized chemical tests without prior lawful arrest).) Although courts have recognized that a lawful arrest is not always a necessary prerequisite to a constitutionally valid blood or breath test (see, *e.g., State v. Anderson* (Me. 1982), 447 A.2d 827), the validity of the test is still crucial to any license suspension under an implied-consent law, and a suspension may not be predicated on the fruits of unconstitutional police activity (*Holland*, 354 F. Supp. at 198-99). We therefore decline the State's invitation to read the statute as authorizing such constitutionally dubious behavior.

■■ Second, and relatedly, the Secretary of State receives his power to suspend the motorist's license from the latter's "implied consent" to the blood and breath tests as a condition of driving on the public highways of the State (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.1). To hold that motorists waive their right to be free of unconstitutional arrests and searches as a condition of operating motor vehicles would do violence to the principle of implied consent. In *Serpas v. Schmidt* (7th Cir. 1986), 808 F.2d 601, the court invalidated administrative rules of the Illinois Racing Board that conditioned the receipt of certain occupational licenses issued by the Board on the licensees' implied consent to a variety of warrantless administrative searches. The court explained that the Board could not validly condition a license on the applicant's waiver of his constitutional right to be free of unreasonable searches and seizures. (808 F.2d at 606-07.) The court in a subsequent action reiterated that the validity of any such implied consent was vitiated by the fact that it was premised on regulations that were unconstitutional and unauthorized because they allowed for

unconstitutional and otherwise illegal searches. *Serpas v. Schmidt* (7th Cir. 1987), 827 F.2d 23, 29-30.

■ Third, even barring constitutional problems, we are unwilling to conclude that the legislature intended to authorize the suspension of drivers' licenses based on the fruits of illegal arrests. The requirements of an arrest and reasonable cause are for the purpose of protecting the motorist against unlawful searches and seizures. (*People v. Carlson* (Colo. 1984), 677 P.2d 310, 317-18.) This purpose would be undercut if not frustrated by allowing the State to benefit from illegal or unauthorized arrests made by its agents. Furthermore, despite·the State's dire warnings that such a legality requirement would necessitate a time-consuming hearing on ancillary issues and thus frustrate the legislative goal of an efficient, expedited proceeding, we note that in the vast majority of suspension cases the requirement of reasonable grounds (Ill. Rev. Stat. 1989, ch. 95½, par. 2—118.1(b)(2)) operates as an exclusionary rule. As most DUI arrests are of motorists who have been driving or in control of vehicles on the highway, the necessary finding of reasonable cause will generally be tantamount to a finding that the arrest was legal, and a finding of no probable cause will necessitate rescission of the suspension even where the motorist has failed or refused to take a blood-alcohol test.

■ ■ We believe the trial court erred in concluding that the legality of the defendant's arrest was not material to the suspension hearing because the exclusionary rule may not be applied to this civil proceeding. Although we agree that this proceeding is civil rather than criminal or quasi-criminal (*People v. Moore* (1990), 138 Ill. 2d 162, 168; see *United States v. Ward* (1980), 448 U.S. 242, 65 L. Ed. 2d 742, 100 S. Ct. 2636), we reiterate that the issue here is not whether the court is to apply a judicially created rule pursuant to its inherent authority but whether the statute should be construed to condition the Secretary of State's power to suspend a driver's license on the presence of a valid arrest. Furthermore, the assumption that the exclusionary rule is necessarily inapplicable to State-initiated civil proceedings is not only incorrect (1 W. LaFave, Search & Seizure §1.7, at 144-73 (2d ed. 1987)) but has been rejected by Illinois courts in the very context here. In *People v. Collins* (1987), 154 Ill. App. 3d 149, and *People v. Decker* (1989), 181 Ill. App. 3d 427, the court reversed denials of petitions for rescission because in each case the necessary finding of probable cause was the fruit of an unlawful arrest. The court, applying the exclusionary doctrine, therefore, found in each case that the statutory requirement of reasonable grounds was not satisfied by the legally admissible evidence. Although we agree

with these cases insofar as they hold that a summary license suspension may not be predicated on an illegal arrest (or the fruits thereof), we prefer to rest our holding here on the construction of the statute that we have put forth rather than on the application of the exclusionary rule as such.

Finally, we note that our holding that the arrest required by the implied-consent statue must be a lawful arrest is in accord with the decisions of the great majority of the courts that have construed implied-consent statutes that do not explicitly require a lawful arrest. *Bath v. Heckers* (Colo. App. 1974), 522 P.2d 108; *State v. Brunner* (1973), 211 Kan. 596, 507 P.2d 233; see *Gallagher v. Michigan Secretary of State* (1975), 59 Mich. App. 269, 229 N.W.2d 410; *Colling v. Hjelle* (N.D. 1963), 125 N.W.2d 453; *State v. Mulcahy* (1985), 202 N.J. Super. 398, 495 A.2d 166, *aff'd in part, rev'd in part on other grounds* (1987), 107 N.J. 467, 527 A.2d 368; *White v. Oklahoma Department of Public Safety* (Okla. 1980), 606 P.2d 1131; *State v. Wetherell* (1973), 82 Wash. 2d 865, 514 P.2d 1069, see also *In re Gardner* (1979), 39 N.C. App. 567, 251 S.E.2d 723 (suspension may be based on illegal but constitutionally valid arrest). Contra *Commonwealth of Pennsylvania, Department of Transportation v. Wysocki* (Pa. 1987), 535 A.2d 77.

The State next argues that, even if the legality of the defendant's arrest is, as we hold, subject to review, the arrest was lawful because the officers' warrantless entry into his home was validated by (1) their reasonable belief that the defendant, having been involved in a serious automobile accident, was in need of their immediate assistance and (2) their need to preserve evidence of the defendant's offense of driving under the influence of alcohol. We hold that the trial court properly rejected both of these asserted justifications and correctly held that the entry and arrest were unconstitutional.

■ We note preliminarily that the " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (*Welsh v. Wisconsin* (1984), 466 U.S. 740, 748, 80 L. Ed. 2d 732, 742, 104 S. Ct. 2091, 2097, quoting *United States v. United States District Court* (1972), 407 U.S. 297, 313, 32 L. Ed. 2d 752, 764, 92 S. Ct. 2125, 2134.) The police therefore bear a heavy burden to demonstrate that a warrantless in-home arrest, which is presumptively unreasonable, is justified by the exigencies of a particular case. (*Welsh*, 466 U.S. at 749-50, 80 L. Ed. 2d at 743, 104 S. Ct. at 2097.) We do not believe that the State has met this burden here.

■■ The State is, of course, correct that the police may make a warrantless entry into a residence when they reasonably believe that

a person within is in need of immediate aid. (*Mincey v. Arizona* (1978), 437 U.S. 385, 392, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2413.) The requirements of this "emergency exception" are:

(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

(2) The search must not be primarily motivated by intent to arrest and seize evidence.

(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. *People v. Bondi* (1984), 130 Ill. App. 3d 536, 539.

■■ Additionally, although the police may seize incriminating evidence that is in plain view during the course of their legitimate emergency activities, the warrantless search must be strictly circumscribed by the exigencies which justify its initiation. *Mincey*, 437 U.S. at 393, 57 L. Ed. 2d at 300, 98 S. Ct. at 2413; *People v. Abney* (1980), 81 Ill. 2d 159, 173.

■■ The State argues that the trial judge applied an improper legal standard in this case, as he required that the State show that the warrantless entry was motivated solely by the policemen's concern for the defendant's well-being, rather than requiring only that the entry not be primarily motivated by an intention to investigate or collect evidence relative to the possible offense of DUI. Although we agree with the State that the trial judge did not apply the correct legal standard, we also conclude that under the facts of this case, as found by the trial court, any such error was harmless. It is clear that the State did not meet its "heavy burden" to show that this case fell within the "emergency exception."

First, the trial judge found that at the time the police entered the house they knew only that the defendant had returned home from the accident, was upstairs sleeping, and, according to a neighbor who would have no motivation to endanger his health, was "out of it" but "fine." The police therefore had no reasonable grounds to believe that the defendant required their immediate assistance to safeguard his physical well-being. See *Lambert v. State* (Okla. Crim. App. 1987), 745 P.2d 1185 (police lacked reasonable grounds for emergency warrantless entry into home when motorist involved in accident called out from within residence that he was all right).

Second, the State did not meet its burden to show that the entry was not motivated primarily by the intent to investigate or seize evidence in connection with the possible DUI offense. Indeed, the conduct of the police could scarcely have been more consistent with such

a purpose and less consistent with an intention to tend to the defendant's possible injuries. Beyond checking the defendant's pulse and breathing, the police did nothing of record to investigate the defendant's possible injuries and a great deal to collect evidence for a possible DUI prosecution. Despite Officer Lewis' testimony that he was concerned that the defendant may have suffered internal injuries from the accident, he ordered the defendant to perform several field sobriety tests during which the defendant fell down a number of times. There is nothing of record to indicate that the police sought to provide medical assistance for the defendant's possible injuries.

Third, this is not a case where the officers' post-entry conduct was limited to achieving the objective justifying the entry. The police plainly did more than was "reasonably necessary to ascertain whether [the defendant was] in need of assistance and to provide that assistance." (2 W. LaFave Search & Seizure §6.6(a), at 706 (2d ed. 1987).) As Professor LaFave has commented, "[a]ny conduct within by the officer which is in any way inconsistent with the purported reason for entry is a just cause for healthy skepticism by the courts." (2 W. LaFave Search & Seizure §6.6(a), at 706 (2d ed. 1987).) Although, as we have noted, the police may seize incriminating evidence in plain view during a legitimate emergency entrance, we know of no case sanctioning police investigation as extensive as that involved here, even pursuant to a valid emergency. We therefore reject the State's argument that the warrantless entry and arrest were validated by the emergency exception.

We also reject the argument of the State that the officers' warrantless entry into the defendant's home was validated by their need to seize and preserve evidence of the defendant's blood-alcohol level. It is settled that warrantless entries into or arrests within a home are prohibited absent probable cause and exigent circumstances. (*Welsh v. Wisconsin* (1984), 466 U.S. 740, 749, 80 L. Ed. 2d 732, 743, 104 S. Ct. 2091, 2097; *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.) The trial judge specifically found that the police did not obtain the requisite probable cause until *after* they made the warrantless entry into the home. The State has never contested this finding. Even assuming *arguendo* that the suspected offense in this case is serious enough to create an exigency (see *Welsh*, 466 U.S. at 750-54, 80 L. Ed. 2d at 743-46, 100 S. Ct. at 2097-2100), the possible destruction of evidence, therefore, does not validate the entry or subsequent arrest in this case.

We hold that, because the arrest on which the summary suspension of the defendant's driver's license was based was not a lawful

and valid arrest, the denial of the defendant's petition for rescission of the suspension must be reversed.

Accordingly, the judgment of the circuit court of Du Page County is reversed, and the cause is remanded for further proceedings consistent with this decision.

Reversed and remanded.

REINHARD, P.J., and UNVERZAGT, J., concur.