THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SANJAY PAUDEL, Defendant-Appellant.

Second District No. 2—91—0593

Opinion filed May 6, 1993.

Thomas J. Mullen, of Mullen, Winthers & Galasso, P.C., of Winfield, for appellant.

James E. Ryan, State's Attorney, of Wheaton, and Lawrence M. Kaschak, of Herbolsheimer, Lannon, Henson, Duncan & Reagan, of La Salle (William L. Browers and John X. Breslin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, Sanjay Paudel, was charged in the circuit court of Du Page County with the offense of unlawful possession of a controlled substance (heroin) (Ill. Rev. Stat. 1989, ch. 56½, par. 1402(b)). Following the trial court's denial of his motion to suppress evidence, defendant was found guilty of this offense in a stipulated bench trial and sentenced to a one-year term of probation (Ill. Rev. Stat. 1989, ch. 56½, par. 1410) and a $200 fine. Defendant argues in this timely appeal that the trial court erred by relying on the medical emergency corollary to the exigent circumstances exception in denying his motion to suppress evidence.

Prior to trial, defendant filed a motion to suppress evidence, asserting that the police violated his fourth amendment rights by entering his residence and conducting a search of his bedroom without a search or arrest warrant and without his consent. At the hearing on that motion, the court heard the testimony of several witnesses.

Officer Robert Mudra testified that on the morning of September 26, 1990, he received a call to report to the defendant's residence concerning an unconscious male. He was the first official person to arrive at this location. He knocked at the door and was admitted by a young woman who told him defendant was passed out and pointed to the location of defendant. Mudra found the defendant lying on the floor and waited for fire fighters and paramedics to arrive. Defendant was lying in a hallway halfway between his bedroom and bathroom in an unconscious and unresponsive state. Paramedics and another officer arrived within a minute and began resuscitation efforts. Mudra spoke to a

second female in the house and asked her the normal questions for the paramedics concerning defendant's medical history. These included questions about defendant's past medical history, whether he was on drugs, and if he was presently taking drugs or prescription medication. This information was to assist the paramedics in their treatment of defendant. Defendant's brother-in-law and a family friend arrived, and Mudra asked them if defendant used drugs, if he was on any medication or if he had other medical problems. They had no knowledge of these facts.

Mudra further testified that he assisted the paramedics and fire fighters by moving equipment and by trying to keep the family isolated from defendant and the paramedics. After 15 or 20 minutes of efforts by the paramedics, they gave defendant an injection and he regained consciousness. They then placed defendant on a stretcher and took him in an ambulance. Mudra assisted by carrying the equipment to the ambulance. The paramedics still needed further information, and defendant told them that he was taking some sort of medication. Mudra then asked the woman he had first spoken with whether he could look around to see if he could locate the medication, and she granted him permission. He searched the bathroom without finding anything and then searched the bedroom. He was searching for the medication because the paramedics needed to know what dosage defendant took. Mudra also spoke to defendant's sister, who gave permission to search both the bathroom and defendant's bedroom for medication. After finding no medication in the bathroom or in plain view in defendant's bedroom, Mudra began looking through dresser drawers and desk drawers while Officer Lewis Hayes looked in the closet. Within two minutes Mudra opened a dresser drawer and found a controlled substance. At that time defendant was either in the ambulance or on his way to the hospital. After the controlled substance was discovered, a friend of the family stated, "I think you guys should stop looking," and the officers complied with his request.

On cross-examination Mudra testified that it is standard procedure for an officer to accompany medical personnel for the purpose of obtaining information and controlling persons at the scene of an incident. At the time of the bedroom search the officers were not engaged in any criminal investigation of anyone in the house. Items found by him in the dresser drawer included a white substance, a large spoon, a rolled-up dollar bill and a baggie.

Officer Lewis P. Hayes testified that on the morning of September 26 he received a call to report to the Paudel residence. When he arrived at least two police units and an ambulance were already at the

scene. The front door of the house was open, and he entered and approached the area where the firemen were assisting defendant. The firemen informed Hayes that defendant was unconscious and not responsive to resuscitation efforts. Hayes then turned to the two young women who were present and asked them questions concerning defendant's general health and activities. He asked whether defendant had done any physical exercise that morning, what he was allergic to, any types of medication, if he was taking medication and whether he was diabetic or had any other physical ailments. He also asked if there had been any history of substance abuse. Both women indicated that defendant was not taking any medication that they knew of, was not allergic to anything and had no history of substance abuse. By that time defendant had been "down" for more than an hour, and Hayes wanted to assist the firemen. A fire fighter informed Hayes that a paramedic had administered Narcan to defendant and that defendant was becoming conscious. The fire fighter said that Narcan is a medication used to neutralize the effects of opiates and that there was a good chance that defendant had used some type of opiate. Hayes heard the paramedics ask defendant whether he was taking any medication, and defendant responded that he was taking Prozac. They asked him what the dosage was, and he stated he did not know. Defendant wanted to get up but the paramedics wanted to keep him down so they could administer aid and talk him into going to the hospital for a checkup. Eventually defendant agreed and was removed from the house on a stretcher and taken to the hospital.

According to Hayes, after defendant was placed in the ambulance Hayes and Mudra asked the two young women for permission to look in defendant's room because it appeared that defendant had left that room on his way to the bathroom when he fell. The officers asked if they could look in the bedroom for the purpose of finding medication which defendant may have taken. It was the officers' intention to communicate the information to the ambulance crew so that they could relay it to the hospital while traveling to the hospital. The officers were looking for any kind of drug which might have been used to cause defendant's condition. Hayes also looked in the bathroom for medication, but he found none. Hayes asked both females for permission to search defendant's room to look for medication. Both said almost in unison that it was okay for the officers to search the room. Hayes testified that he would not have conducted the search without their consent. Hayes testified that he looked in the closet to see if there was anything in the open that was visible. Mudra looked on the desk and opened the drawer of the dresser where he removed a

spoon, a rolled-up dollar bill and a white powdery substance. At that time the two previously mentioned young women were in the room along with a man.

After the controlled substance was found, the man indicated that he thought that there should be no further search. The women agreed that the search should stop, and the officers ceased making any further search in the house. Hayes told the man that because there was an indication that the powdery substance had been used by defendant the officers would take it and advise the hospital accordingly.

On cross-examination Hayes testified that the reason why he did not obtain a search warrant was because he was worried about defendant's health and wanted to get as much information to the ambulance crew or paramedics so that they could take anything that may have been injurious to defendant's health to the hospital with him. He is trained in CPR and reported to defendant's residence to give assistance because he had been told that defendant had been unconscious for approximately an hour.

On redirect examination Hayes was asked whether he searched any other locations within the house for medication or drugs. He answered that he looked into another bedroom located off the hallway, but there was no intrusion into any closed or locked spaces or any drawers or cabinets.

Miss Uma Shrestha, a friend of defendant's family, who resided in defendant's residence, testified that on September 26, 1990, she discovered defendant lying unconscious in the hallway of the residence. After unsuccessfully attempting to revive defendant, she telephoned another friend of the family, Anju Shrestha, for assistance. Within five minutes Anju Shrestha arrived and called an ambulance at approximately 8:40 a.m. Within 15 to 20 minutes an ambulance arrived and Uma and Anju directed several paramedics to defendant's location. The paramedics began to give emergency assistance to defendant, and within 5 or 10 minutes a police officer arrived and directed Uma and Anju to go to another room. Following the arrival of a second officer, one of the police officers asked Uma whether defendant used any drugs. She responded that he did not. The officer asked whether defendant had eaten anything that morning, and Uma answered that she did not know. The officer then directed his questions to Anju. Uma further testified that after several minutes another family friend, Ohm Dewan, arrived and spoke with the officers. About 10 minutes after Dewan arrived, the paramedics told the family members that defendant was "just fine." During this time one of the officers was roaming around near the family room.

The paramedics placed defendant on a stretcher and began taking him to the ambulance. Defendant awoke near the doorway and began asking what had happened. The paramedics responded that they were taking him to the hospital, and defendant stated that he did not wish to go. The paramedics asked defendant if he was taking medication, and he said he was, giving them a name of a medication. One of the officers told defendant that he had to go with the paramedics. An officer then asked Uma, Anju and Mr. Dewan if they would please go with the officer to search defendant's room. They walked together to defendant's room accompanied by three officers. One of the officers entered a closet while another officer started to look on the bed and under the mattress. The third officer looked at the desk and dresser, pulling out all the dresser drawers. He also began to search books by shaking them. In one drawer the officer found a drug and a spoon. The officer who was searching the bed also searched in the pillow and under the bed. Uma said that at no time was she asked where the family kept medication, and she did not observe officers entering a bathroom. After the officer found a drug and a spoon in a drawer, they stopped searching and came out of the bedroom.

On cross-examination Uma testified that at the time of the incident she was residing as a guest in defendant's home. She had her own bedroom, a key to the house and access to the other rooms of the house. After the officer found the drug and spoon in defendant's bedroom, they stopped searching and asked Mr. Dewan if they could search the rest of the house. He declined to give them permission.

Anju Shrestha testified that on the morning of the incident she was in her apartment when she received a call from Uma. Before leaving her apartment, Anju called an ambulance and then went directly to defendant's house. When she arrived she found the door open and, upon entering, saw Uma and found defendant lying on the floor by a bathroom. When their efforts to revive defendant were unsuccessful, Anju again called for an ambulance. It was 20 or 25 minutes before the ambulance arrived and two paramedics entered the house. They left the exterior door open slightly. A few minutes later, Officer Hayes and another officer arrived and entered the door without asking permission. After going to see defendant, one of the officers directed Anju and Uma to the living room and began asking them questions. He asked Anju whether she knew if defendant took any drug or medicine or sold any drugs. Anju answered that she had no knowledge of these matters. She asked the officer what kind of drug he was referring to, and the officer responded that he meant co-

caine. The officer who asked the questions was Officer Hayes. Officer Hayes denied Anju's request to see defendant.

Hayes then began questioning Mr. Dewan, and he asked Dewan's permission to search the house. Dewan did not respond to the request. Anju heard Hayes' comment to Officer Mudra that "something fishy" was going on and that they should search the house. The officers did not ask her whether defendant was taking prescription drugs. After Sergeant Hayes finished speaking with Dewan, Hayes went to defendant's room without permission and began to search the room. At that time defendant was still on the floor. One of the officers asked if they could search the entire house and was refused permission. During the search of defendant's room the officers searched the closet, the bed, books, a garbage container and the dresser drawers. When the officer found a powdery substance in a drawer, he said, "this is the thing we are looking for." Anju at no time saw the officers go into the bathroom.

Ohm Dewan testified that he is a friend of defendant's family. On the morning of September 26 he was at home when he received a phone call from defendant's house from Anju. Anju reported that defendant was not breathing and was having trouble. Dewan said that he went immediately to defendant's residence arriving at approximately 9:30 a.m. Before leaving his home, he called 911 and requested that an ambulance be sent to the residence.

When Dewan arrived, he saw two police cars and two or three ambulances at defendant's house. As he entered, Dewan was met by Officers Mudra and Hayes, who questioned him concerning his relationship to the family. Thereafter there was a lot of commotion as the paramedics were attempting to revive defendant. He heard one of the officers say that it looked like defendant had some reaction to the medicine he was taking. Someone mentioned that defendant took Prozac. Defendant was lying on a stretcher in the hallway right outside his bedroom door. When defendant became conscious someone told him that he was being taken to Good Samaritan Hospital, and defendant kept saying that he was doing fine and asked why he had to go.

There was communication between the paramedics and the police concerning defendant's having taken medicine. Dewan saw defendant as he was being removed from the hallway and observed that he was conscious. He was breathing fine, and his body movements appeared to be normal. Defendant was responding to questions of the paramedics.

As they were standing outside the door of defendant's room Officer Mudra asked Dewan if he minded if they looked around. Because

they didn't have authority to say yes or no, Dewan and Anju just looked at each other at which time Mudra began searching the room while Hayes observed. Mudra searched the mattress, a garbage can, under pillows, through the books and bookshelf, and began opening dresser drawers. He found a spoon, a rolled-up dollar bill and a white powder in one of the drawers and said, "it looks like we found something." Officer Hayes then asked if they could search the rest of the house. Dewan declined to give his consent. The officers then stopped the search and took the evidence and defendant with them as they left for the hospital. At no time did the officers ask Dewan where the family kept prescription drugs, and he did not recall their having searched the bathroom.

On cross-examination Dewan admitted that he, Uma and Anju had not told the officers not to search prior to their discovery of the white powder. They assumed that the officers were looking for prescription drugs or something which defendant may have inadvertently taken and, therefore, they did not object.

Officer Robert Mudra was recalled as a witness by the State. He testified that when he arrived at defendant's residence on the morning of September 26 the first person he spoke to was Uma Shrestha. The second person he spoke with that morning was Phadam Paudel. Both individuals said that they resided within the house.

Anju Shrestha testified in rebuttal that she did not tell the officer on that morning that her name was Phadam Paudel.

Based on the foregoing testimony, the trial court denied defendant's motion to suppress evidence, stating:

"THE COURT: Based upon the facts presented and the law as it applies, it is the finding of the Court that the police officers, first of all, had a right to enter the petitioner's residence.

Since there was a call made for an ambulance and fire department paramedics, there was a requirement for assistance of the police to these personnel individuals.

Once the condition of the petitioner was determined to be that he was unconscious, the police officers had a further right to check the living quarters, mainly the washroom and the bedroom, for any evidence of medication or similar products so that medical personnel could properly deal with the situation they had at hand.

The situation presented to the police officers was one of a medical emergency exception to the hearsay and seizure law.

There was an emergency situation that was posed here. The threat to life and safety of the petitioner required a reasonable

search under the circumstances, which was done, and validly conducted by the police department."

The court found it unnecessary to rule on the issue of consent.

On April 27, 1991, in a stipulated bench trial the court admitted the evidence adduced at the suppression hearing together with the evidence derived from the search and found defendant guilty of the offense as charged.

Defendant first argues that the trial court erred in denying his motion to suppress the evidence because the police officers illegally entered his residence without a warrant.

It is undisputed that defendant had a reasonable expectation of privacy within the residence and to his personal possessions in the bedroom. As defendant correctly asserts, the fourth amendment proscribes all unreasonable searches and seizures, and warrantless searches of private residences are considered to be *per se* unreasonable absent the applicability of a specifically established and well defined exception. (*Mincey v. Arizona* (1978), 437 U.S. 385, 390, 57 L. Ed. 2d 290, 298-99, 98 S. Ct. 2408, 2412.) The fourth amendment, however, "does not bar police officers from making warrantless entries and searches when they 'reasonably believe that a person within is in need of immediate aid.' " *People v. Koniecki* (1985), 135 Ill. App. 3d 394, 398, quoting *Mincey*, 437 U.S. at 392, 57 L. Ed. 2d at 300, 98 S. Ct. at 2413.

We have recognized an exigent circumstances exception to exist when it is reasonably necessary for officers to make a warrantless entry into a home for the purpose of rendering emergency aid. (*People v. Speer* (1989), 184 Ill. App. 3d 730, 737-38.) Such exception is recognized only where officers reasonably believe an emergency exists which mandates immediate action to aid persons or property within the home. (*Speer*, 184 Ill. App. 3d at 738.) The reasonableness of the belief that an emergency exists must be evaluated with regard to the totality of the circumstances known to the officers at the time of their entry. (*People v. Mitran* (1990), 194 Ill. App. 3d 344, 347.) The purpose, to offer assistance to a possibly imperiled person, not to obtain evidence of a crime, justifies such a search. *People v. Meddows* (1981), 100 Ill. App. 3d 576, 580.

In the present case, defendant argues that although his friends called for an ambulance to assist him, they did not specifically request police assistance and that officers entered the residence without permission after nonpolice medical personnel had already arrived and were attending to defendant.

Officer Mudra, on the other hand, testified that he received a call to report to defendant's residence concerning "an unconscious male." He said he was the first person to arrive and he was admitted into the residence by a young woman who directed him to defendant's location in a hallway. Officer Hayes testified that he responded to the same call and entered through the open front door after Mudra and the paramedics were inside the house rendering assistance to defendant. Both officers described their duties in rendering assistance to the medical personnel who were attempting to revive defendant who, by that time, had reportedly been unconscious for more than an hour.

■ The trial court found from this testimony that the officers had a right to enter the home based upon the nature of the emergency. It is the function of the trial court to determine the credibility of the witnesses, the weight to be accorded their testimony, and what inferences may legitimately be drawn from the evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 298.) The trial court's determination on a motion to suppress evidence will not be reversed on appeal unless it is manifestly erroneous. (*People v. Redd* (1990), 135 Ill. 2d 252, 289.) We conclude that the trial court heard sufficient evidence of exigent circumstances to find that the officers acted reasonably in entering defendant's residence.

Defendant next argues that even if the officers were justified in entering the residence based upon the report of his condition, they had no basis or authority for conducting a search of his bedroom. Any analysis of this contention must necessarily focus upon the fundamental requirements for application of the emergency exception which this court has previously recognized:

"(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

(2) The search must not be primarily motivated by intent to arrest and seize evidence.

(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." *People v. Krueger* (1991), 208 Ill. App. 3d 897, 908.

Defendant argues that once he regained consciousness and began to communicate with the paramedics there was no longer any emergency requiring the involvement of police personnel. He further points out that the search of his bedroom was conducted after the paramedics had taken control of any emergency and after defendant had been removed from the residence.

■ As the trial judge observed, however, the mere fact that a person has regained consciousness does not in itself establish that all danger has been alleviated or that the person's life or safety is not still threatened by the cause of the unconsciousness. It is common knowledge that a drug overdose is sometimes a cause of death and that a person who is apparently suffering from an overdose must be regarded as being dangerously ill and in need of immediate assistance. Time is ordinarily of the essence, and police, fire and medical personnel responding to apparent overdose emergencies are naturally expected to act swiftly and efficiently. Officer Mudra testified that it is customary procedure for officers to accompany medical personnel to assist in obtaining information necessary for treatment of the endangered person. Officer Hayes testified that it is almost a standard practice for officers to search the area for medication when responding to calls in which the victim is under medication. In this case, the paramedics required information concerning the nature and amount of any substance ingested by defendant. This information was to be relayed to the hospital to aid in defendant's diagnosis and treatment. It is not unreasonable to expect that those responding to the emergency would employ all available resources, including the involvement of participating police investigators, to expedite the pursuit of this vital information. The need for this information was not diminished by the removal of defendant from the house. In our view the trial court did not err in finding that the emergency was ongoing at the time the officers searched the bedroom for the purpose of obtaining information which would facilitate defendant's treatment for an overdose.

The trial court was further required, however, to examine the motives of the officers who conducted the search. As defendant contends, if their primary motivation was to find and seize evidence of a crime, their actions cannot be justified on medical emergency grounds. See *Krueger*, 208 Ill. App. 3d at 908-09.

The officers here were informed by a paramedic that defendant was responding favorably to an injection of Narcan, a medication used to neutralize the effects of opiates. According to Sergeant Hayes, the paramedic expressed an opinion that defendant had probably used an opiate. Further, defendant reportedly told the paramedics that he had taken the drug Prozac but did not know the dosage. We conclude that the trial court was provided with an evidentiary basis to determine that the officers' primary objective was to aid in the treatment of an overdose by identifying the substance ingested by defendant. Even if the trial court gave credence to the testimony of defense witness Anju Shrestha alleging that she overheard one officer say to the

other, "There's something fishy going on here, you know, something must be going on. We should search the house, you know," this statement does not necessarily establish that the officers' primary motive was to gather evidence for a potential criminal prosecution.

We must next consider the related question of whether the trial court was correct in its determination that it was reasonable to search the particular area of the residence, *i.e.*, defendant's bedroom. As noted above, the emergency exception to the warrant requirement applies only when there is some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. (*Krueger*, 208 Ill. App. 3d at 908.) The conduct of the officers conducting the search under the emergency exception must always be consistent with the purported reason for the warrantless entry. *People v. Abney* (1980), 81 Ill. 2d 159, 173-74.

Defendant contends that if, as the State claims, the true objective of the officers was to obtain information relating to medication ingested by defendant, it is logical to conclude that their search would have been confined to the bathroom, where one might ordinarily expect medications to be kept. Yet, according to defense witnesses, the officers were not observed to have searched the bathroom, and they made no inquiry as to where prescription medication was kept by the family. Defendant argues that the nature of this police conduct further supports the defense assertion that the officers were primarily concerned with seizing contraband for evidentiary purposes.

Both officers, however, testified that they looked for medication in the bathroom but found none. Further, the officers said that they asked both young women for permission to search defendant's room for medication and that both women agreed to the search. Aside from any issue of a valid consent to search, the trial court might reasonably have interpreted this testimony as demonstrating that the women were consulted concerning the officers' objective in locating substances and could have disclosed any relevant information known to them. The credibility and legitimate interpretation of this testimony was the function of the trial court. (*Akis*, 63 Ill. 2d at 298.) Moreover, it appears that defendant's argument that a search for "medication" should have been restricted to the bathroom is founded upon a faulty premise, *i.e.*, that the officers were necessarily confined to a search for prescription medication and were accordingly prohibited from looking for controlled substances. In our view, the officers were not required to interpret defendant's statement to the paramedics as establishing that the only substance he had ingested was Prozac, particularly in view of their knowledge that defendant, moments earlier,

had been revived by an injection of Narcan, and the paramedic's opinion that defendant had probably taken an opiate. The fact that officers may have been searching for any dangerous substance, including controlled substances, does not in itself evidence a primary motive to seize evidence for use in a criminal prosecution.

Defendant was discovered lying unconscious in a hallway approximately midway between his bedroom and the bathroom. Considering the proximity of defendant's room to the location where he was found unconscious in the hallway, the trial court might have reasonably found a probable connection between the nature of the emergency and the place searched. Under the circumstances of this incident, it would not have been unreasonable for the officers to believe that a dangerous substance might have been located in defendant's room.

Defendant further argues that even assuming a right of the officers to look for substances in his room, they exceeded the permissible scope of that search by opening a closed dresser drawer to discover the contraband. Defendant relies upon our statements in *People v. Speer* (184 Ill. App. 3d 730) for the proposition that the medical emergency exception authorizes an inspection of only those areas in plain view of the officers after their entry into that part of the residence relating to the emergency. Defendant's reliance on *Speer* is misplaced. In that case officers entered an apartment in search of a woman believed to be the victim of a drug overdose. While looking for the woman, they saw drugs and drug paraphernalia in plain view. We were not required in that case to address the issue of whether officers during an emergency entry may ever search hidden places closed to their view. We will now do so.

Certainly the authority to enter a private residence for the purpose of rendering emergency assistance to an endangered person must not be perceived as an invitation to officers to conduct an exploratory search unrelated to the purpose of their entry. (See *Abney*, 81 Ill. 2d at 173-74.) A warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio* (1968), 392 U.S. 1, 26, 20 L. Ed. 2d 889, 908, 88 S. Ct. 1868, 1882; *People v. Abney* (1980), 81 Ill. 2d 159, 173-74.

Considering the range of variable circumstances which may potentially confront emergency personnel in the course of their duties, it seems unwise to forge in the abstract any absolute and inflexible rules governing the permissible scope of their inspection within a premise. "As to what may be done by the police or other public authorities once they are inside the premises, this must be assessed upon a case-by-case basis, taking into account the type of emergency which ap-

peared to be present." 2 W. LaFave, Search & Seizure §6.6(a), at 705 (2d ed. 1987).

In *People v. Smith* (1969), 44 Ill. 2d 82, our supreme court considered the admissibility of evidence taken without consent from the wallet of a gunshot victim. An officer at the shooting scene removed the wallet from the person of the semiconscious victim and later examined it at the station house, finding a note implicating the man in a murder. After finding that the defendant had waived the issue, the court commented that although there had been no arrest of the man to support a search incident to arrest, the taking and examination of the wallet was justified, in view of the emergency, as "an appropriate police measure." (*Smith*, 44 Ill. 2d at 87.) The court reasoned that the wallet might have contained information of value in the wounded man's treatment, such as information as to the man's identity, his blood type, diabetic condition, allergies to medications, etc. *Smith*, 44 Ill. 2d at 87-88.

It would seem that the rationale for authorizing a search of places closed to the view of emergency personnel must be the same as that which justified their initial entry into the residence, that being the reasonable necessity of making the intrusion in light of the exigencies of the particular emergency. It would make little sense to suggest that officers could make a warrantless emergency entry into a dwelling to aid a heart attack victim but would be defeated in their efforts for lack of authority to open a medicine cabinet to locate the person's heart medication. The interior of a closed medicine cabinet is no more within the officers' plain view than were the contents of the gunshot victim's wallet in *Smith*, yet such factors as the nature of the life-threatening occurrence, the good-faith objective of the officer, the urgency of the situation, and the peculiar necessity of the search may combine to render an otherwise impermissible intrusion reasonable under the particular circumstances.

■ In the present case, the trial court found credible the officers' explanation that they were striving to assist in defendant's emergency treatment by inspecting probable locations in the immediate area of defendant's location for medications and drugs. We cannot conclude that the trial court was incorrect in its implicit assessment that a dresser drawer in defendant's nearby bedroom would be a reasonably likely location for such substances. We conclude that the denial of defendant's motion to suppress evidence was not manifestly erroneous.

Because we affirm the trial court's ruling sustaining the search on the basis of exigent circumstances, it is unnecessary to consider the

question of whether the search was conducted pursuant to a valid consent.

Based on the foregoing, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

WOODWARD and GEIGER, JJ., concur.