The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Gary C. HAZELHURST and James
Monroe Jefferson, III,
Defendants-Appellees.

Nos. 82SA581 and 82SA583.

Supreme Court of Colorado,
En Banc.

May 2, 1983.

Warwick Downing, Dist. Atty., Cortez, for plaintiff-appellant.

Michael E. McLachlan, Durango, for defendant-appellee, Gary C. Hazelhurst.

Timothy A. Patalan, Durango, for defendant-appellee, James Monroe Jefferson, III.

ERICKSON, Justice.

This interlocutory appeal was taken by the prosecution pursuant to C.A.R. 4.1. The prosecution seeks reversal of an order of the district court suppressing evidence obtained as a result of an investigatory stop. We reverse the order of suppression in part, affirm in part, and remand for further proceedings consistent with this opinion.

On April 6, 1982, the sheriff's office received information from backpackers about the cultivation of marijuana in a remote and largely inaccessible area in Montezuma County. An investigation located three areas at the bottom of Yellow Jacket Canyon where marijuana was being farmed. The farms were on Bureau of Land Management land approximately a mile and a half from the end of a four-wheel-drive road. Full investigation of the area and the extent of the farming operation was made by helicopter on April 17, 1982, after the reports of the backpackers were confirmed by an on-site investigation of the area by the sheriff's office on April 8, 1982, and April 16, 1982.

On April 16, 1982, the sheriff's office discovered a 1951 Dodge pickup truck on the north rim of Yellow Jacket Canyon and the truck registration was traced to Gary Hazelhurst, who lived in Clifton, Colorado, a suburb of Grand Junction. Boot tracks were followed from the truck down into the canyon and to one of the marijuana farms. Investigators also found various tools, hoses, and pumps, as well as other equipment that was used to farm the marijuana. All of the material was under a tarpaulin that was painted to provide camouflage for the cache.[1] Sleeping bags, food, and a backpack were also discovered under the tarpaulin. Many items in the cache had markings indicating that they had been purchased in Grand Junction. A search of the backpack found in the cache produced an airline tag on which the name "Jeff Jefferson" was printed.

On April 17, 1982, when the helicopter investigation was conducted, the truck had been moved, part of the material observed at the cache on April 8 had been removed, and fresh tire tracks were observed. As a result of the investigation, officers were sent to the site where the four-wheel-drive road entered Yellow Jacket Canyon to look

---

1. The defendants did not challenge the legality of the search at the farm sites and we need not address that issue in this appeal.

for similar tracks. When the officers arrived, they saw tire tracks similar to those described by the investigating officers. The tracks were fresh and had a knobby-type tread. Not long after the officers observed the tracks, a new Toyota pickup with a camper and two occupants came up the four-wheel-drive road. The officers stopped the truck. The officers noted that the tires on the Toyota were of the knobby type and matched the tracks leading down into the canyon. A temporary license bearing the name Gary Hazelhurst was in the rear window of the truck. Hazelhurst acknowledged that the truck was his. James Jefferson, a passenger in the truck, also identified himself and said that he lived in Grand Junction. Hazelhurst was asked if he had seen anyone in the canyon. He told the officers that he had seen a couple of people on horseback. He also told the officers that he was in the canyon looking for Indian ruins.

The officers radioed the chief investigating officer and asked if he desired to talk to Hazelhurst. He replied that he did. He instructed the officers "to keep both of those people there." The officers asked Hazelhurst if he would follow them to their police cars because the investigator wanted to talk to him. The officers did not ask the defendants to get out of the truck and, when no objection to the request to wait was made, the officers returned to their cars. Hazelhurst followed the police officers a short distance to the place where the officers had parked their cars and waited approximately twenty to thirty minutes for the chief investigator from the sheriff's office to arrive.

When the chief investigator arrived, he noted that some of the items in the truck such as planting boxes and farming equipment matched the items that were in the cache when it was initially discovered. A formal arrest was then made. Thereafter, both Hazelhurst and Jefferson made damaging admissions after having been given their *Miranda* warnings. All of the evidence seized and the defendants' inculpatory statements were suppressed by the district court as the product of an arrest without probable cause and as the fruit of the poisonous tree. *Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway. v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

The police charged Gary Charles Hazelhurst and James Monroe Jefferson III with unlawfully and feloniously possessing and cultivating more than one ounce of marijuana in violation of section 18–18–106, C.R.S. 1973 (1982 Supp.). After a preliminary hearing, the defendants were bound over to the district court for trial. Thereafter, a motion to suppress was made and after an evidentiary hearing the evidence seized from and statements made by the defendants were suppressed.

## I.

### The Investigatory Stop

The concatenation of the facts and circumstances, if not sufficient to establish probable cause, provide the foundation and a basis for an investigatory stop. In determining whether there was a basis for an investigatory stop, it is necessary to determine whether the totality of the circumstances—the whole picture—provides the officers with a particularized and objective basis for suspecting that a person or persons are engaged in criminal activity. The analysis must include objective observations, information obtained by fellow police officers, and consideration of the modes or pattern of operation of certain kinds of law breakers. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). A trained police officer is qualified to draw inferences and make deductions that might elude an untrained person. The officer's assessment must center on whether there is an articulable suspicion that a particular person is engaged in wrongdoing. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The touchstone supporting po-

lice action is the specificity of the information upon which they act.

■ In *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971), we upheld the validity of investigatory stops in Colorado. *Stone* stops are valid when: (1) the police officers have a reasonable suspicion that the person stopped has committed, or is about to commit, a crime; (2) the purpose of the detention is reasonable; and (3) the character of the detention is reasonable in light of its purpose. 174 Colo. at 509, 485 P.2d at 497. *See also People v. Johnson,* 199 Colo. 68, 605 P.2d 46 (1980); *People v. Tooker,* 198 Colo. 496, 601 P.2d 1388 (1979); *People v. Severson,* 39 Colo.App. 95, 561 P.2d 373 (1977).

■ The investigatory stop by the deputy sheriff and the state trooper was based on information provided to them by fellow officers. We have held in warrantless arrest situations that an arresting officer who does not personally know facts that provide probable cause may still effect a warrantless arrest if he "acts upon the direction or as a result of a communication from a fellow officer" and "the police, as a whole," know facts which rise to the level of probable cause. *People v. Baca,* 198 Colo. 399, 401, 600 P.2d 770, 771 (1979). *See also People v. Henry,* 631 P.2d 1122 (Colo.1981); *People v. Hamilton,* 188 Colo. 250, 533 P.2d 919 (1975). In *People v. Nanes,* 174 Colo. 294, 300–01, 483 P.2d 958, 962 (1971), we said:

> "It is not necessary for the arresting officer to know of the reliability of the informer or to be himself, in possession of information sufficient to constitute probable cause, provided he acts upon the direction or as a result of communication with a brother officer or that of another police department and provided the police as a whole are in possession of information sufficient to constitute probable cause to make the arrest."

The fellow officer rule is also applicable in determining whether the police have a reasonable suspicion that the person detained pursuant to a *Stone* stop has committed or is about to commit a crime.

■ The prosecution has conceded that the officers making the investigatory stop did not have a reasonable suspicion that Hazelhurst had committed a crime. The officers making the stop, however, were relying on information provided to them by the investigating officers. The lead investigator had evidence which supported a belief that Gary Hazelhurst and "Jeff" Jefferson were involved in cultivating marijuana and had advised one of the officers making the stop to look for Hazelhurst who might be driving an old pickup.

The "police as a whole" knew that two persons named Hazelhurst and Jefferson were involved in some manner in the clandestine farming of marijuana. *People v. Baca, supra.* The Dodge pickup truck had been traced to Hazelhurst. They also knew that Hazelhurst lived near Grand Junction, where a number of the farming tools and implements in the cache had been purchased. Jefferson was identified from a tag left in a backpack at the farm sites. Officers at the farm sites were aware that the Dodge truck had been moved recently, which is significant because of the remote location of the farm sites and the small number of people in the vicinity. The officers making the stop had identified Hazelhurst and Jefferson and had been told previously that Hazelhurst was a suspect in the case, although no information had been supplied linking Jefferson to the alleged crimes. One officer had been warned to look for the tracks made by a "knobby-type" tread. In sum, the police as a whole knew that criminal activity was in progress because the farm sites had been visited in the week between the investigations of the sites. Evidence that the area had been visited on the day of arrest had been discovered by the investigating officers. The inaccessible and remote location of the farm sites combined with recent activity in the area support an inference that suspects were still in the vicinity. Based on the

totality of the circumstances, the facts give rise to a reasonable suspicion that the two men were involved in a crime and that a *Stone* stop was proper.

 A suspect may be temporarily detained pursuant to a *Stone* stop provided that the character of the detention is reasonable in the light of its purpose. *People v. Stone, supra.* In *People v. Schreyer,* 640 P.2d 1147, 1150 (Colo.1982), we held that a "temporary police detention made for the purpose of questioning a suspect who might otherwise escape is limited to determining an individual's identity or obtaining an explanation of his behavior." A longer detention or a search is permissible if the individual's consent has been obtained. *See Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); 3 W. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9:2 (1983 Supp.). The trial court ruled that Hazelhurst and Jefferson had not consented to the twenty to thirty minutes detention and that the two men were effectively placed under arrest when they were not permitted to leave the area after the brief investigatory stop. As we said in *People v. Schreyer,* "[a]lthough an investigatory stop itself does not constitute an arrest, whenever detention and questioning by a police officer are more than brief and cursory, there is an arrest which must be supported by probable cause." 640 P.2d at 1150. Because the detention in this case was beyond the ambit of an investigatory stop, it must be supported by probable cause.

## II.

### Probable Cause to Arrest

 Whether probable cause to arrest exists depends upon objective facts. *People v. Fratus,* 187 Colo. 52, 528 P.2d 392 (1974). The court must determine whether the facts available to a reasonably cautious officer at the moment of arrest warranted the belief that an offense had been or was being committed by the person arrested. *People v. Navran,* 174 Colo. 222, 483 P.2d 228 (1971). In assessing probable cause, the totality of the evidence known to the arresting officer, including information obtained from fellow officers, and such other circumstances as support a conclusion that a crime has been committed, may be considered. Admissibility of the evidence relied upon by the trained police officer is not the test. *People v. Gonzales,* 186 Colo. 48, 525 P.2d 1139 (1974). Probable cause to arrest must be determined on a case-by-case basis after reviewing the particular facts and circumstances which existed at the time of the arrest. *People v. Lucero,* 174 Colo. 278, 483 P.2d 968 (1971).

 In our view, the sheriff had probable cause to arrest Gary Hazelhurst based upon the information provided to him by the investigating officer. When Hazelhurst was positively identified pursuant to the valid investigatory stop, an arrest supported by probable cause was permissible. The arrest of James Jefferson, however, which occurred as a result of the impermissible detention, was not based upon information supplied by the investigatory officer and therefore was not supported by probable cause. Accordingly, we reverse the district court as to Gary Hazelhurst and affirm as to James Jefferson.

The "fellow officer rule" provides the basis for Hazelhurst's arrest. Under the rule as enunciated in *People v. Baca, supra,* an officer who has probable cause to arrest a suspect may request that a fellow officer make the arrest without informing the officer as to all the facts which form the basis for probable cause. The request to arrest can be conclusory and there are no "magic words" which must pass from officer to officer. It is enough that some communication between the officers was made and that the arresting officer is acting as a result of that communication. *See* 1 W.

LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 3.5 (1978 & 1983 Supp.). The realities of modern police work require a rule which recognizes that often many officers will be assigned to investigate the same case. In some cases, the investigating officers may have sufficient evidence to establish probable cause even when the arresting officer does not. The Fourth Amendment protects against seizures by the government without probable cause; it does not require an individualized probable cause analysis of all the facts and circumstances by the officer making the arrest. The fellow officer rule, however, is not a means of creating probable cause by using *post hoc* combinations of information available to the police. The rule does not permit the police to cull its archives in hopes of justifying an arrest which is not supported by probable cause. Here, the investigation coupled with the facts known to the fellow officer who directed the arrest established probable cause.

The officers making the stop in this case were aware of the pending investigation of the marijuana farms and were acting pursuant to instructions from an officer who had information implicating Gary Hazelhurst. The investigation established that a 1951 Dodge pickup truck was registered to Gary Hazelhurst of Clifton, Colorado (a town near Grand Junction) and that many of the items included in the cache were purchased in Grand Junction. Hazelhurst was tied to the marijuana farms not only by the footprints leading to the farms from his truck, but also by his possession of planting boxes of the type located at the cache and by the tire tracks leading into the canyon where the farms and the cache were located. Hazelhurst's presence in the area on the same day that the farm sites had been visited provided the police ample basis for a "belief that an offense had been or was being committed by the person arrested." *People v. Navran, supra.* The arresting

officer, acting as a result of a communication received from the investigating officer, therefore had probable cause to arrest Hazelhurst upon learning his identity.

The communication which provided the basis for the arrest was made after Hazelhurst and Jefferson were identified. One of the arresting officers testified that he radioed Officer Leichliter, the investigating officer, and told him that Gary Hazelhurst had been stopped.[2] The arresting officer testified that "[w]e were advised them to stay there and to keep both of those people there." The officers were also told that Officer Leichliter wanted to talk to the two men about the marijuana farms. The communication from a fellow officer with probable cause to arrest forms the basis for Hazelhurst's detention. *People v. Baca, supra.*

The detention of Jefferson, however, cannot be sustained on the basis of the fellow officer rule. The record discloses that the arresting officer had been given no information that Jefferson was implicated in the farming scheme. Although the investigating officer had some reason to suspect "Jeff Jefferson" of involvement in the scheme, those suspicions were never relayed to the arresting officer, nor was other evidence presented which would provide probable cause to arrest Jefferson. *People v. Henry, supra.* The detention of Jefferson was therefore improper and the trial court's suppression order as to Jefferson must be sustained.

The suppression order of the district court is reversed as to Hazelhurst and affirmed as to Jefferson. The cause is remanded to the district court for further proceedings consistent with this opinion.

ROVIRA, J., concurs in part and dissents in part.

HODGES, C.J., joins in the concurrence and the dissent.

---

2. Officer Leichliter does not remember asking the arresting officers to detain Jefferson but

does recall the conversation pertaining to Hazelhurst.

ROVIRA, Justice, concurring in part and dissenting in part:

I concur in that part of the majority opinion which reverses the trial court's order as to Hazelhurst, and dissent to the affirmance of the suppression order as to Jefferson.

With reference to the investigatory stop, I disagree with the conclusion of the majority that, under the facts and circumstances present here, the "detention . . . was beyond the ambit of an investigatory stop, [and] it must be supported by probable cause." The record reflects that the defendants, upon being stopped by the police, agreed to wait for the investigating officer to arrive. They were not ordered from their truck, frisked, or questioned beyond the initial identification. They voiced no objection to the 20- or 30-minute wait necessitated by the distance and rugged mountain country which the investigating officer had to traverse in order to arrive at the scene.

A detention of 20 to 30 minutes is permissible if made with the consent of the person being detained. *See Florida v. Royer*, —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

Based on the facts stated in the majority opinion and my reading of the record, there is absolutely nothing to support a conclusion of involuntary detention, and, therefore, probable cause was not necessary to support the investigatory stop.

Since I conclude that there was no impermissible detention of either of the defendants, I do not subscribe to the conclusion reached in the majority opinion that the arrest of Jefferson "which occurred as a result of the impermissible detention, was not based upon information supplied by the investigatory officer and therefore was not supported by probable cause." (at 1086). The investigating officer, prior to making personal contact with the defendants, knew that a toilet kit found in a knapsack at the cache site contained an airline identification tag with the name "Jeff Jefferson" on it. After arriving at the scene where the defendants had been stopped, he had, based on the totality of the evidence, probable cause to arrest Jefferson. Not only was his name tag found at the cache area, but his presence with Hazelhurst in the remote and desolate area, along with the evidence he saw in the back of the truck (planting boxes and farm equipment which matched the items that were in the cache when it was initially discovered), was sufficient to establish probable cause for Jefferson's arrest.

I would reverse the suppression order of the district court as to both defendants and remand for further proceedings.

I am authorized to say that Chief Justice HODGES joins me in this concurrence and dissent.