**PEOPLE of the State of Colorado,**
**Plaintiff–Appellant**

v.

**Russell Armando ARIAS,**
**Defendant–Appellee.**

**No. 07SA17.**

Supreme Court of Colorado,
En Banc.

June 4, 2007.

Mark D. Hurlbert, District Attorney, Fifth Judicial District Karen A. Romeo, Assistant District Attorney Kristine H. Word, Deputy District Attorney Breckenridge, Colorado, Attorneys for Plaintiff–Appellant.

The Law Offices of Todd Barson, P.C. Heather Beattie Breckenridge, Colorado, Attorneys for Defendant–Appellee.

Justice MARTINEZ delivered the Opinion of the Court.

The People bring this interlocutory appeal pursuant to C.A.R. 4.1 and section 16–12–102(2), C.R.S. (2006), to reverse a trial court ruling suppressing evidence seized following a traffic stop. The prosecution contends that an air freshener hanging from the rearview mirror of a truck provided the reasonable suspicion necessary to conduct a traffic stop. In the alternative, the prosecution argues that law enforcement's collective knowledge of the truck's activities rose to reasonable suspicion under the fellow officer rule.

Despite the trial court's expressed reservations that section 42–4–201(4), C.R.S. (2006), prohibiting the obstruction of a driver's vision, is unconstitutionally vague, the court ultimately applied the statute in a constitutional manner and subsequently found that notwithstanding the statute, the police lacked the reasonable suspicion necessary for a traffic stop. The court also found that the fellow officer rule was inapplicable. We affirm.

## I. Facts and Procedural History

On January 12, 2006, Summit County Drug Task Force agents witnessed what they believed to be a drug transaction from a 2004 white Dodge Ram truck. Agents followed the truck for several days, until they suspected their presence had been detected. Wanting to continue surveillance, agents obtained

a warrant to place a Global Positioning System ("GPS") device on the truck so it could be tracked remotely.

On the morning of January 26, 2006, agents trailing at a distance observed the truck make several stops in Silverthorne and Georgetown before driving toward Denver. At approximately 2:30 pm, agents believed they witnessed the truck speeding down I-70, however they did not clock its speed. Upon arriving in Denver, the truck again made numerous stops. Task Force officers saw the driver making a series of short phone calls. The driver also frequently changed lanes for no discernable reason, as well as periodically driving around the block and down dead end streets. Believing the driver was involved in drug activity, the Drug Task Force agent in charge contacted the Denver police dispatch at approximately 5:00 pm to request that a uniformed patrol officer conduct a traffic stop and seek permission to search the truck. However, the agent in charge did not inform dispatch about the earlier observations nor did he tell Denver Police that he believed these observations established a basis to stop the truck. Instead, he specifically requested that the patrol officer develop an independent basis for a traffic stop so that the driver would not discover the nature and extent of the surveillance.

Hearing the dispatch broadcast, Denver Police Department patrolman Eric Gray pulled in behind the Dodge truck on East Colfax Avenue. He followed the truck for over a dozen blocks, observing no traffic violations. However, Officer Gray did notice what he believed to be a tree-shaped air freshener hanging from the rearview mirror. Believing that the air freshener was in violation of section 42-4-201(4), a statute that prohibits obstructions of a driver's vision through the windshield, Officer Gray stopped the truck and contacted the driver, Russell Armando Arias ("Arias"). Officer Gray requested Arias' license and registration. Failing to produce proper identification, Arias did provide his name and date of birth. When Officer Gray ran this information through the National Crime Information Center ("NCIC") database, he learned that Arias' Colorado driver's license was suspended and that Arias had an active warrant for his arrest. Officer Gray then cited Arias for having an obstruction in his windshield and placed him under arrest based on the warrant. A pat-down search subsequent to the arrest found a small bag of marijuana in Arias' pant pocket. The truck was impounded and a search of the passenger compartment produced fifteen grams of cocaine. Arias was then charged with one count of conspiracy to distribute a controlled substance in violation of section 18-18-405, C.R.S. (2006).

At a pretrial hearing, Arias moved to suppress evidence collected as a result of the traffic stop. He claimed that Officer Gray did not have reasonable articulable suspicion to believe that Arias had violated a traffic law. He further argued that in the absence of the reasonable suspicion necessary for an investigatory stop, evidence gathered during the stop and subsequent search must be suppressed.

The prosecution countered that Officer Gray did possess reasonable suspicion to believe that Arias' vision might be obstructed by the air freshener. Alternatively, the prosecution argued that if Officer Gray did not possess reasonable suspicion, the collective knowledge of the Drug Task Force agents was sufficient to validate the stop under the fellow officer rule.

At the hearing, Officer Gray testified that he was on patrol in northeast Denver when he was informed by a dispatch broadcast that Drug Task Force agents following a white Dodge Ram truck needed a uniformed officer to perform a traffic stop. Officer Gray told the court that the broadcast did not indicate that Drug Task Force agents had an independent basis to stop the truck. Instead, Officer Gray "took it [to mean] that if [he found] probable cause to make a stop or if there was an infraction or some kind of law that was being broken to go ahead and make a stop and investigate further." Absent that, Officer Gray was "to let the car go." Officer Gray then told the court that in attempting to develop his own basis for stopping the truck, the only possible ground he discovered was the air freshener hanging from the rear-

view mirror. Officer Gray expressed his view that air fresheners routinely violate the windshield obstruction statute, and he has stopped drivers "many times" for this same infraction.

The prosecution also called three Drug Task Force agents to testify as to the truck's activities in the two weeks leading to the traffic stop. The agents told the court about the suspected drug sale two weeks prior to the arrest, the resulting surveillance, and the events of January 26, 2006. The Drug Task Force officer in charge testified he told dispatch that patrol officers should contact the truck. He asked that the officers "develop their own probable cause on the vehicle for a traffic violation, in which they would conduct a traffic stop and determine whether they could get consent to search the vehicle."

After considering the testimony, the trial court made three findings. First, the court made the factual determination that the air freshener was "an undefined size" and that there was "never any testimony as to [its] actual size." Second, the court found that Officer Gray testified that "the object hanging from the rear-view mirror, quote, could have obstructed the windshield." However, no showing was made that Officer Gray believed it obstructed the driver's vision *at the time of the stop*. Based on this finding, the trial court determined that Officer Gray did not have reasonable suspicion to believe that Arias was driving a truck in violation of section 42–4–201(4). Finally, the court found that the fellow officer rule was inapplicable because Officer Gray was specifically instructed to develop his own basis for stopping Arias' truck. The prosecution brought this interlocutory appeal.

## II. Analysis

■ The issue in a suppression case is one of mixed law and fact. *People v. Arroya*, 988 P.2d 1124, 1129 (Colo.1999). While we generally defer to the trial court's findings of fact "when there exists sufficient evidence in the record to support them," the court's conclusions of law are subject to our de novo review. *People v. Adkins*, 113 P.3d 788, 791 (Colo.2005). Thus, while deferring to the trial court findings of fact, we review de novo

its conclusion that the evidence seized as a result of this traffic stop must be suppressed.

Here, the prosecution asks that we reverse the trial court's finding that Officer Gray lacked reasonable articulable suspicion that Arias was in violation of section 42–4–201(4). In the alternative, the prosecution contends that, under the fellow officer rule, law enforcement's collective knowledge of the truck's earlier activities constituted sufficient reasonable suspicion to validate the stop. We disagree with both assertions.

### A. Reasonable Suspicion to Stop

■ The legality of an investigatory stop is determined by an examination of the criteria originally set out in *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). There, the United States Supreme Court held that the Fourth Amendment to the Constitution allows police officers to conduct a brief investigatory stop based on a reasonable suspicion that criminal activity is occurring or is about to occur. *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. Such a stop is legal if three conditions are met: (1) the officer must have a reasonable suspicion that a crime has occurred, is occurring, or is about to occur; (2) the purpose of the stop must be reasonable; and (3) the scope and character of the detention must be reasonable when considered in light of its purpose. *Michigan v. Long*, 463 U.S. 1032, 1052 n. 16, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). In Colorado, we have recognized and adopted the Supreme Court's criteria for determining the legality of an investigatory stop. *See People v. Altman*, 938 P.2d 142, 144 (Colo. 1997).

■ The United States Supreme Court has further defined "reasonable suspicion" for a traffic stop as requiring "some minimal level of objective justification for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The application of the reasonable suspicion standard is highly fact sensitive and, therefore, not "readily, or even usefully, reduced to a neat set of legal rules." *Id.* Facts that might seem innocent when viewed in isolation can sustain a finding of reasonable suspicion

when considered in the aggregate, so long as the officer maintains an objectively reasonable belief that the collective circumstances are consistent with criminal conduct. *See People v. Smith,* 13 P.3d 300, 306 (Colo.2000).

The applicable standard for evaluating an investigatory stop is whether police have "an articulable and specific basis in fact" for suspecting that a defendant is involved in criminal activity, requiring a totality of the circumstances examination. *Id.* (quoting *People v. Sutherland,* 886 P.2d 681, 686 (Colo.1994)). In making this determination, the police must have more than an "unparticularized suspicion or hunch" that the suspect is engaged in criminal activity. *People v. Rahming,* 795 P.2d 1338, 1341 (Colo.1990) *(quoting Terry,* 392 U.S. at 27, 88 S.Ct. 1868). This inquiry is objective and must be viewed in light of "the facts and circumstances known to the officer immediately prior to the stop." *Smith,* 13 P.3d at 306.

Here, Officer Gray testified that he was notified by dispatch that a Drug Task Force agent needed a uniformed officer to find an independent basis to stop Arias' truck. Officer Gray identified the truck, pulled in behind, and followed it for several blocks without witnessing a traffic violation. He did, however, notice an object he believed to be an air freshener hanging from the rearview mirror. Officer Gray stated that he observed the air freshener through the truck's back privacy glass, and that it hung by a rubber band approximately five to six inches below the rearview mirror. Upon further questioning, however, Officer Gray testified that when he approached the vehicle he noticed that it was "large" but he did not verify the size of the air freshener, its angle of position, or whether the air freshener actually obstructed the driver's vision.

Officer Gray cited Arias for violation of section 42–4–201(4), which states:

No vehicle shall be operated upon any highway unless the driver's vision through any required glass equipment is normal and unobstructed.

The officer testified that having stopped vehicles "many times" for air fresheners or like items hanging from a rearview mirror, he believed that it was legal to stop a vehicle solely on the basis that an air freshener was hanging from the rearview mirror.

Defense counsel called Arias to rebut Officer Gray's testimony. The defendant told the court that there were actually three small air fresheners instead of one large one and that none of the three hung more than one inch from the rearview mirror. He also testified that the air freshener in no way obstructed his vision.

Upon review of the statute and testimony, the trial court concluded that Officer Gray failed to articulate a reasonable basis to believe the air fresheners obstructed the driver's vision.[1] The court further concluded that the air freshener was not an obstruction to the driver's vision under the statute. Because the stop was based exclusively on the air freshener, the court found that Officer Gray did not have a reasonable articulable basis for stopping the truck. We agree that the trial court's factual findings compel the conclusion that the officer lacked a reasonable basis for stopping Arias.

To stop a vehicle based on section 42–4–201(4), there must be more than a possibility that the driver's vision is obstructed. An officer must reasonably believe that the statute is being violated or is about to be violated, and he must be able to communicate this reasonable belief to the court. Here, Officer Gray testified that he pulled over Arias because the air freshener "could have" obstructed the driver's vision through the windshield. The trial court appeared to conclude from this testimony that Officer Gray believed the air freshener hanging from the

---

1. The trial court first questioned the constitutionality of section 42–4–201(4). It stated that it was "unable to determine the legislative intent" of section 42–4–201(4). The court further stated that section 42–4–201(4) was unconstitutionally "nebulous and unclear [such that the court] ... could not reasonably conclude based upon the evidence in this case whether ... [the air freshener] in any way obstructed the view of the driver." Despite these comments, the court eventually applied section 42–4–201(4) to consider whether the prosecution demonstrated that Officer Gray had a reasonable articulable suspicion that the driver's view was obstructed.

rear-view mirror was in violation of the statute without regard to whether the driver's vision through the windshield was actually obstructed.

Because Officer Gray did not testify with any specificity how the air freshener was displayed in the windshield or how the angle of vision may have actually been obstructed, he did not persuade the court that his belief that the air freshener obstructed the driver's vision was reasonable. Instead, after reviewing the testimony and expressing some concern about the constitutionality of the statute, the trial court applied the statute in a constitutional manner and found that the prosecution failed to present evidence showing that the officer articulated a reasonable belief that the object actually obstructed the vision of the driver at the time he pulled Arias over.

We accept the trial court's findings. Observing an air freshener or like item hanging from a rearview mirror is not automatically a basis for a traffic stop. Instead, the officer must reasonably believe the air freshener actually obstructs the driver's vision through the windshield. We defer to the trial court's findings that the evidence here was insufficient to show that Officer Gray reasonably believed the driver's vision through the windshield was obstructed at the time he pulled Arias over.

Thus, we conclude that the trial court correctly determined that Officer Gray did not have reasonable and articulable suspicion to believe that a crime had been committed at the time he initiated the traffic stop.[2]

### B. Fellow Officer Rule

■ Having determined that the air freshener alone was not sufficient reasonable suspicion of a violation of section 42–4–201(4) as required by *Terry*, 392 U.S. at 30, 88 S.Ct. 1868, we consider the People's alternative theory. The People contend that under the fellow officer rule, law enforcement as a whole possessed sufficient information to constitute a reasonable basis to make the

investigatory stop. The trial court found, however, that the Drug Task Force agent in charge specifically requested that a uniformed officer not rely on existing information and instead develop an independent basis for the stop of Arias' truck, thus making the fellow officer rule inapplicable. We agree.

■ The fellow officer rule provides that a law enforcement officer who does not personally possess a sufficient basis to make an arrest nevertheless may do so if (1) he acts at the direction or as a result of communications with another officer, and (2) the police as a whole possess a sufficient basis to make the arrest. *People v. Baca*, 198 Colo. 399, 401, 600 P.2d 770, 771 (1979); *see also People v. Freeman*, 668 P.2d 1371, 1377 (Colo.1983). The purpose of the fellow officer rule is to allow law enforcement agencies to work together as a team instead of requiring that each officer possess the particularized information necessary to make the arrest. Wayne R. LaFave, Jerold H. Israel & Nancy J. King, *Criminal Procedure* § 3.3(e) (2d ed.1999). The fellow officer rule may be used to find both probable cause and reasonable suspicion. *See Baca*, 198 Colo. 399, 600 P.2d 770; *People v. Pigford*, 17 P.3d 172, 176 (Colo.App.2000). In the present case, we consider whether the fellow officer rule may be utilized to justify Officer Gray's investigatory stop of Arias even though it was not relied upon to make the stop.

■ The United States Supreme Court first considered the fellow officer rule in *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). There, the Court found that the "observations of fellow officers of the government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *Ventresca*, 380 U.S. at 111, 85 S.Ct. 741. The Court later expanded the fellow officer rule to include officers outside the common investigation, as long as they are actually informed or directed to make an arrest based on existing probable cause.

**2.** Having determined that Officer Gray lacked reasonable and articulable suspicion that a crime occurred, we need not consider the second or third prongs of the analysis. In addition, we do not consider the constitutionality of the statute here because the trial court correctly applied the statute to require a "normal" and "unobstructed" view consistent with safe driving.

*Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). This expansion allows various law enforcement agencies to work together to stop criminal activity. Potential abuse of the fellow officer rule is averted by requiring that the officer be instructed or directed to make the stop based on existing reasonable suspicion. For instance, an officer may not illegally stop a vehicle in hopes of finding that there is a warrant out on the driver. Instead, the fellow officer rule requires that the officer must act on a communication from another officer and the communication must arise from already existing probable cause or reasonable suspicion. *See, e.g., People v. Reed,* 56 P.3d 96, 100 (Colo. 2002).

Here, however, the Drug Task Force agent in charge did not direct Officer Gray to stop Arias based on existing information. Instead, the agent informed dispatch that a Denver patrol officer should find an independent basis for stopping the truck because he wished to keep the Task Force activities secret. As a result, Officer Gray was instructed to develop his own justification for the traffic stop. Because law enforcement officers chose not to rely on the existing information known to the Task Force agents at the time of the traffic stop, the People cannot later claim that, through the fellow officer rule, information is imputed to Officer Gray. Because the traffic stop was not based on existing reasonable suspicion of fellow officers, the trial court was correct in finding that the fellow officer rule does not apply.

### III. Conclusion

We hold that the trial court was correct to suppress evidence found as a result of the traffic stop because its findings support the conclusion that the officer did not have reasonable articulable suspicion that a violation of section 42–4–201(4) may have been occurring at the time of the stop. We also hold that the trial court properly concluded that the fellow officer rule is inapplicable where the stop was not based on information possessed by fellow officers.

Accordingly, we affirm the ruling of the trial court.

Justice EID dissents, and Justice RICE and Justice COATS join in the dissent.

Justice EID, dissenting.

The majority finds that although the trial court "expressed reservations" that subsection 42–4–201(4), C.R.S. (2006), was unconstitutionally vague, it still made factual findings—to which the court defers—to justify suppression. Maj. op. at 135, 139. As I read the record of this case, however, the trial court's reservations about the constitutional vagueness of the statute prevented it from making factual findings. I would resolve the vagueness question by holding that the statute prohibits only those obstructions that hinder the driver's view in an unsafe manner. Because I would remand the case for consideration of the facts under this standard, I respectfully dissent from the court's opinion.

The trial court in this case was clearly concerned about what it saw as the vagueness of subsection 42–4–201(4). Referring to the statutory language, which prohibits driving "unless the driver's vision through any required glass equipment is normal and unobstructed," the trial court stated that it "[did not] know what normal is considering the myriad of [kinds] of vehicle[s] and windshields that exist." The court went on to note that vehicles are equipped with rearview mirrors attached to the upper center portion of the windshield. "Apparently that [positioning of the rear-view mirror] is recognized within the purview of the statute [as] being something which does not obstruct a view. . . ." However, the court continued, it was "unable to determine what the legislative intent was of the meaning of the word 'unobstructed.'" "If it means nothing whatsoever within the view within the glass," the court opined, "then the rear-view mirror itself, of course, obstructs vision. If it means something which would . . . obstruct the view which a driver could safely have of the road and sufficient to observe conditions around him or her to drive, *then the statute doesn't say that.* It merely says unobstructed." (emphasis added).

The trial court thus rejected an interpretation of the statute that would link the statute's requirement of an unobstructed view with safety concerns. Instead, the court considered the term "unobstructed" to be "*so nebulous and unclear that it could not reasonably conclude based upon the evidence in this case that[,] whether there was one or three air fresheners with an undefined size to them, whether they in any way obstructed the view of the driver.*" (emphasis added). In other words, regardless of the size or number of air fresheners hanging from the rear-view mirror, the trial court could not make a conclusion about whether there was an obstruction of the driver's windshield due to the fact that the statutory term was "so nebulous and unclear." The court went on to base its suppression ruling on the fact that Officer Gray had been told to develop an independent basis to stop the defendant's vehicle so that he could obtain his consent to search.[1] Maj. op. at 136.

It is true, as the majority points out, that the trial court noted that the air freshener was of "undefined size" (although, as the majority also points out, Officer Gray testified that it was "large"). *Id.* at 137, 138. But the point of the trial court's ruling was that it could not make a decision on whether there was an obstruction of the windshield— regardless of the evidence. The majority makes a mistake, then, by "accept[ing]" and "defer[ring] to" the trial court's factual "findings." *Id.* at 139. There weren't any factual findings, or, if there were, they were colored by the court's concerns about vagueness. *See id.*

The majority then compounds that error by drawing a conclusion from those "findings"—namely, that "[t]he trial court appeared to conclude ... that Officer Gray believed the air freshener hanging from the rear-view mirror was in violation of the statute without regard to whether the driver's vision through the windshield was actually obstructed." *Id.* at 138–39. There is simply

nothing in the record to support this conclusion. On the contrary, when Officer Gray was specifically asked by the prosecutor whether it "appear[ed] to [him] at the time [he pulled the defendant over] that the large tree-shaped air freshener could have obstructed the driver's point of view or vision," he answered "Yes, *it did* .... [I]t was hanging down ... directly where his field of vision would have been." (emphasis added). Officer Gray didn't think he could pull over anyone with something hanging on his rear-view mirror; rather, the trial court was concerned that the statute—due to its vagueness—allowed him to.

The majority's mistaken view of the record leads it to making some problematic legal pronouncements as well. The majority faults Officer Gray for not testifying "with any specificity" as to "how the air freshener was displayed in the windshield or how the angle of vision may have actually been obstructed...." Maj. op. at 139; *see also id.* at 138 (noting that when Officer Gray "approached the vehicle he noticed that [the air freshener] was 'large' but he did not verify the size of the air freshener, its angle of position, or whether the air freshener actually obstructed the driver's vision"). These inferences from the record might be relevant to whether the defendant *actually violated* subsection 42–4–201(4). But that's not the question before us. The question we face is whether Officer Gray had *reasonable suspicion* to stop the defendant for a violation of subsection 42–4–201(4). In other words, the question is not whether Officer Gray, after stopping the defendant, measured the air freshener, or determined the angle at which it was hanging. Instead, the question is whether, before stopping the defendant, Officer Gray had reasonable suspicion that the defendant was violating subsection 42–4–201(4). *See People v. Smith*, 13 P.3d 300, 306 (Colo.2000). This is an objective inquiry and must be viewed in light of "the facts and circumstances known to the

---

1. The majority does not specifically address the trial court's conclusion that the stop was pretextual, a conclusion based on the fact that Officer Gray had been told to develop an independent basis to stop the defendant's vehicle. If Officer Gray had reasonable suspicion to stop the defen-

dant for an obstructed view, it would not matter what his subjective motivations were. *See People v. Thompson*, 793 P.2d 1173 (Colo.1990) (holding that the objective standard for determining probable cause obviates the need to analyze the officer's subjective motivation).

officer *immediately prior to the stop." Id.* (emphasis added).

Given the trial court's concerns about the vagueness of subsection 42–4–201(4), I would address those concerns outright. A law is unconstitutionally vague if "it does not provide fair warning of the conduct prohibited or if its standards are so ill-defined as to create a danger of arbitrary and capricious enforcement." *People v. Shell,* 148 P.3d 162, 172 (Colo.2006) (internal quotation marks omitted). In this case, subsection 42–4–201(4) gives "fair warning" of the conduct prohibited, as it is clearly concerned with safety; indeed, the provision is entitled, "Obstruction of view or driving mechanism—hazardous situation." *See also* § 42–4–201(2) ("No person shall knowingly drive a vehicle while any passenger therein is riding in any manner which endangers the safety of such passenger or others."); § 42–4–201(5) ("No passenger in a vehicle shall ride in such position as to create a hazard for such passenger or others, or to interfere with the driver's view ahead or to the sides...."). Thus, a driver is prohibited from driving unless his or her view is "normal" and "unobstructed"—that is, safe for driving.

The majority apparently agrees with me that the statute's requirement of unobstructed vision is linked to safety concerns. *See* maj. op. at 139 n. 2 (explaining that subsection 42–4–201(4) "require[s] a 'normal' and 'unobstructed' view consistent with safe driving"). But the trial court mistakenly rejected this interpretation on the belief that the statute was vague. Because the trial court's concerns about the vagueness of subsection 42–4–201(4) prevented it from making factual findings, or, at the very least, colored those findings, I would remand for reconsideration of the facts under the interpretation of subsection 42–4–201(4) articulated in this opinion. I therefore respectfully dissent.

I am authorized to state that JUSTICE RICE and JUSTICE COATS join in this dissent.