2014 CO 12

**Ronald Brett GRASSI, Petitioner**

**v.**

**The PEOPLE of the State of Colorado, Respondent.**

**Supreme Court Case No. 11SC720**

Supreme Court of Colorado.

February 18, 2014

Rehearing Denied March 24, 2014

Douglas K. Wilson, State Public Defender, Ned R. Jaeckle, Deputy State Public Defender, Denver, Colorado, Attorneys for Petitioner

John W. Suthers, Attorney General, Brock J. Swanson, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent

JUSTICE BOATRIGHT delivered the Opinion of the Court.

¶ 1 We granted certiorari to determine whether the police possessed probable cause pursuant to the fellow officer rule to draw blood from an unconscious driver following a motor vehicle accident, even though the officer who actually ordered the blood draws lacked independent probable cause.[1] We hold that the fellow officer rule imputes information that the police possess as a whole to an individual officer who effects a search or arrest if (1) that officer acts pursuant to a coordinated investigation and (2) the police possess the information at the time of the search or arrest. Because the record in this case reflects that the police as a whole, pursuant to a coordinated investigation, possessed probable cause to believe that the defendant had committed an alcohol-related offense at the time of the blood draws, the fellow officer rule imputed that probable cause to the officer who ordered the blood draws, meaning no Fourth Amendment violation occurred. Accordingly, we affirm the judgment of the court of appeals.

## I. Facts and Procedural History

¶ 2 On September 4, 2003, Petitioner Ronald Brett Grassi was involved in a single-car accident at approximately 3:50 a.m. Grassi, the driver of the car, suffered serious injuries, and a passenger in the car was killed. Paramedics transported Grassi to a local hospital for treatment, where he remained unconscious for several hours.

¶ 3 At 4:17 a.m., Trooper Benavides arrived at the crash site. Because the accident had resulted in a fatality, Trooper Benavides contacted both his supervisor and an accident

reconstruction team through the police department's dispatch unit. Trooper Benavides then "walked the crash site," searching for the potential cause of the accident. He discovered no evidence of skid marks, yaw marks,[2] or roadway obstruction, nor any suggestion that the driver had applied the brakes. Furthermore, the weather conditions were "clear and dry and ... fairly warm." Based on his preliminary observations, Trooper Benavides could find no external explanation for the crash, instead testifying that "[i]t looked like the car just ran off the right side of the roadway."

¶ 4 At 4:58 a.m., Trooper Waters, an accident reconstruction specialist, arrived on the scene. Over the next two hours, Trooper Waters examined the crash site and ultimately corroborated Trooper Benavides's initial suspicions, concluding that no "mechanical defects or failures occurred that could have contributed to or ... caused the crash." Moreover, Trooper Waters deduced at the scene that the driver of the vehicle had likely followed the fog line[3] off of the roadway, which "[i]ntoxicated drivers have a propensity" to do. Trooper Waters completed his investigation prior to the time of the blood draws.

¶ 5 Meanwhile, shortly after 5:00 a.m., Corporal Riley directed Trooper Duncan to travel to the hospital where Grassi was being treated. Specifically, Corporal Riley assigned Trooper Duncan[4] the task of investigating whether a male driver had recently been transported from the crash site and to obtain a blood draw if Trooper Duncan determined "that alcohol was involved." Trooper Duncan arrived at the hospital shortly after

---

1. Specifically, we granted certiorari to consider the following issue:
   Whether the court of appeals erred in holding that a police officer had probable cause to order an involuntary blood draw from a defendant by imputing the findings of an accident reconstruction analysis to the officer under the "fellow officer rule" even though (1) the findings were unknown to the officer at the time he ordered the blood draw and (2) the officer did not order the blood draw at the behest of anyone who knew the findings.

2. A yaw mark is created when a vehicle's tires slide laterally. According to Trooper Bena-

vides's testimony, the presence of yaw marks can suggest that "there was an input from the driver, whether it be a reaction or an overreaction."

3. A fog line is a solid white line that runs along the right edge of a roadway.

4. It is unclear from the record whether Corporal Riley spoke with Trooper Duncan directly or whether Corporal Riley contacted dispatch, which in turn contacted Trooper Duncan. It is undisputed, however, that Trooper Duncan traveled to the hospital at Corporal Riley's behest.

5:30 a.m. and learned from a paramedic that Grassi was the driver who had been injured in the accident. Although Grassi remained unconscious, Trooper Duncan detected a strong odor of alcohol emanating from Grassi's mouth. Trooper Duncan then ordered a blood draw, which a phlebotomist[5] performed at 7:12 a.m.; the phlebotomist later conducted a second blood draw at 7:51 a.m. Prior to these blood draws, the police knew collectively that Grassi had been driving the vehicle when it crashed, that no road conditions or other external factors appeared to have caused the crash, that Grassi's driving was consistent with that of an intoxicated driver, and that his breath smelled of alcohol. The blood draws then revealed that Grassi's blood alcohol content ("BAC") exceeded the legal limit for driving under the influence of alcohol or drugs ("DUI"), as provided by section 42–4–1301, C.R.S. (2013).

¶ 6 The People initially charged Grassi with vehicular homicide, manslaughter, and driving with excessive BAC, and they later amended the complaint to add a charge for DUI. At trial, Grassi moved to suppress the evidence of his BAC, arguing that the police lacked probable cause to order the blood draws and thus violated his Fourth Amendment right to privacy. The trial court denied his motion, finding that Colorado's express consent statute, § 42–4–1301.1(8), C.R.S. (2013), did not require the police to possess probable cause in order to draw blood from an unconscious driver. As a result, the People introduced evidence of Grassi's BAC at trial, and a jury ultimately found him guilty of all charges.

¶ 7 Grassi appealed, and the court of appeals reversed the trial court's finding regarding probable cause and remanded for further proceedings. *People v. Grassi*, 192 P.3d 496, 498 (Colo.App.2008). Specifically, the court of appeals held that the police cannot draw blood from an unconscious driver absent probable cause that he had committed an alcohol-related offense. *Id.* The court of appeals thus remanded the case so that the trial court could determine whether

the police in fact possessed probable cause to order the blood draws. *Id.*

¶ 8 On remand, the trial court conducted an evidentiary hearing, at which it heard testimony from Troopers Benavides, Duncan, and Waters.[6] The trial court then considered "what the police knew at the time of the draw." Applying the fellow officer rule, the trial court aggregated the knowledge of the three troopers and found that, at the time of the first blood draw, the police as a whole possessed sufficient information to reasonably believe that Grassi had committed an alcohol-related driving offense and thus had probable cause to order the blood draws.

¶ 9 Grassi again appealed, and the court of appeals affirmed. *People v. Grassi*, —— P.3d ——, ——, 2011 WL 4837291, at *1 (Colo. App. Oct. 13, 2011). In its probable cause analysis, the court of appeals considered not only Trooper Duncan's observations but also those of Trooper Waters, noting that Trooper Waters, the accident reconstruction specialist, had surveyed the crash site before the phlebotomist performed the blood draws. *Id.* at —— – ——, 2011 WL 4837291 at *3-4. The court of appeals then applied the fellow officer rule and held that the rule did "not require direct contact between [Troopers] Duncan and Waters in order for the latter's observations to enter into the probable cause determination." *Id.* at ——, 2011 WL 4837291 at *4. Therefore, the court of appeals concluded that the police as a whole possessed probable cause at the time of the blood draws. *See id.* at ——, 2011 WL 4837291 at *5.

¶ 10 We granted certiorari to consider whether the fellow officer rule provided the police with probable cause to order the blood draws.

## II. Standard of Review

■ ¶ 11 In reviewing a suppression order, we defer to the trial court's findings of fact as long as they are supported by competent evidence. *People v. Gutierrez*, 222 P.3d 925, 931–32 (Colo.2009). We review the trial court's conclusions of law de novo. *Id.* at 931.

---

5. A phlebotomist is a medical technician who is specifically certified to collect blood.

6. Corporal Riley did not testify at the evidentiary hearing on remand.

## III. Analysis

¶ 12 Under Colorado's express consent statute, a person who drives a motor vehicle within the state must submit to a breath or blood test "when so requested and directed by a law enforcement officer *having probable cause* to believe that the person was driving a motor vehicle in violation of the prohibitions against DUI" or other alcohol-related offenses. § 42–4–1301.1(2)(a)(I) (emphasis added). The statute further provides that "[a]ny person who is dead or unconscious shall be tested to determine the alcohol or drug content of the person's blood ... as provided in this section." § 42–4–1301.1(8). Thus, the narrow issue here is whether Trooper Duncan possessed probable cause to order the phlebotomist to draw Grassi's blood. That issue, however, implicates a specific legal question: whether Trooper Benavides's and Trooper Waters's observations at the scene of the accident could be imputed to Trooper Duncan—and thus factor into the probable cause analysis—pursuant to the fellow officer rule.

¶ 13 We have previously established that the fellow officer rule operates to impute information that the police possess as a whole to an individual officer. *See People v. Arias*, 159 P.3d 134, 139 (Colo.2007). We now consider whether the rule imputes that information either at the time of the police's initial assignment to an outside officer (as Grassi contends) or at the time of that officer's ultimate action (as the People contend).

### A. Timing of the Fellow Officer Rule

■ ¶ 14 It is well-established that law enforcement officers regularly engage in coordinated investigations when working a case. *See United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."). As such, "[W]here law enforcement authorities

are cooperating in an investigation, ... the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). In some situations, however, the police expand the scope of their investigation to include other officers not currently on scene. In those scenarios, the fellow officer rule operates to integrate those outside officers and make them part of the coordinated investigation. *See Arias*, 159 P.3d at 139–40 (recognizing that the fellow officer rule functions to "include officers outside the common investigation").

■ ¶ 15 Specifically, we have previously held that the fellow officer rule imputes shared information to an individual officer if two conditions are met: First, the officer must act "at the direction [of] or as a result of communications with another officer," thus ensuring that he acted pursuant to a coordinated investigation. *See id.* at 139. Second, "the police as a whole" must possess the information. *See id.* The rationale supporting the rule is that law enforcement officers regularly work as a team, meaning each individual officer need not "possess the particularized information" that forms the basis for conducting a search or making an arrest. *See id.*[7] Thus, the rule reflects the "realities of modern police work" and "recognizes that often many officers will be assigned to investigate the same case." *People v. Hazelhurst*, 662 P.2d 1081, 1086–87 (Colo.1983) (noting, in the context of an arrest, that the Fourth Amendment "does not require an individualized probable cause analysis of all the facts and circumstances by the officer making the arrest"). We have cautioned, however, that law enforcement may not wield the fellow officer rule in order to "creat[e] probable cause by using *post hoc* combinations of information available to the police." *Id.* at 1087. As such, the police may not "cull its archives" subsequent to a search or arrest "in hopes of justifying [a search or] arrest

---

7. The majority of our case law surrounding the fellow officer rule involves the legality of an arrest rather than a search. *See, e.g., People v. Hazelhurst*, 662 P.2d 1081, 1086 (Colo.1983) (holding that the fellow officer rule justified the defendant's arrest). The rule's rationale, however, is equally applicable to a search prior to an arrest, as both scenarios require probable cause. *Cf. Arias*, 159 P.3d at 139–40 (considering whether the fellow officer rule justified an investigatory stop based on other officers' reasonable suspicion).

which is not supported by probable cause." *Id.*

¶ 16 It is clear, then, that the fellow officer rule imputes information from one officer to another; it is less clear, however, precisely when that imputation occurs. More specifically, when an outside officer is assigned to join an ongoing coordinated investigation, we have never considered whether the fellow officer rule encompasses information discovered *after* the initial assignment but *before* the ultimate action (i.e., the search or arrest).

■ ¶ 17 Grassi contends that the rule only applies to information that the police possess at the time of the assignment. Thus, under Grassi's view of the doctrine, any information that the police gather *subsequent* to the assignment is not imputed under the fellow officer rule. We do not read the fellow officer rule so narrowly. The rule does impute information from officers who possess it to those who do not, but it does not require a linear chain of communication from one officer to the next. Rather, the rule pools the collective knowledge of officers engaged in a coordinated investigation. *See Arias,* 159 P.3d at 139 ("The purpose of the fellow officer rule is to allow law enforcement agencies to work together as a team...."). Thus, the rule reflects the "realities of modern police work," *Hazelhurst,* 662 P.2d at 1087, recognizing that different officers who perform distinct duties are nevertheless working collaboratively in the same case.

■ ¶ 18 Furthermore, any contrary rule would preclude the police from considering any information that they discover subsequent to their assignment, even though their investigation may be ongoing. That is, a contrary holding would essentially force law enforcement officers to conduct their investigations in discrete, linear stages rather than working together as a cohesive unit. We do not wish to limit the fellow officer rule in this fashion, as doing so would both frustrate its purpose and ignore the collaborative process inherent to criminal investigation. Instead, the more appropriate reading of the fellow officer rule is that, as long as the police remain engaged in a coordinated investigation, the rule encompasses information that the police as a whole possess at the time of the relevant action (i.e., the search or arrest).

¶ 19 In reaching this conclusion, we distinguish our earlier holding in *Arias.* In that case, drug enforcement agents were surveilling a pickup truck, believing the driver to be "involved in drug activity." 159 P.3d at 136. The agents contacted the local police department's dispatch unit and requested that it send a patrolman to conduct a traffic stop and search the truck. *Id.* Because the agents wanted to maintain their cover, however, they did not relay their suspicions of the driver's drug activity to dispatch; rather, they specifically requested the local police to "develop an independent basis for a traffic stop so that the driver would not discover the nature and extent of the surveillance." *Id.* Subsequently, a patrolman followed the truck for several minutes before pulling it over, suspecting that an air freshener hanging from the truck's rearview mirror unlawfully obscured the driver's view. *Id.* During the traffic stop, the patrolman ran the defendant's name through a crime database and learned that a warrant was outstanding for his arrest. *Id.* The patrolman then arrested the driver, and a subsequent search of the truck yielded fifteen grams of cocaine. *Id.*

¶ 20 We held that the trial court correctly suppressed the evidence of the search, concluding that the patrolman's independent observations did not provide him with reasonable suspicion that the driver had violated any traffic laws. *Id.* at 140. We further held that the fellow officer rule did not impute the drug agents' observations to the patrolman. *See id.* Specifically, we recognized that because the drug agents explicitly directed the patrolman to develop an independent basis to stop the truck, they affirmatively "chose not to rely on the existing information known to [them] *at the time of the traffic stop.*" *Id.* (emphasis added). As such, we declared that "the People cannot later claim that, through the fellow officer rule, information is imputed to" the patrolman. *Id.* Thus, in *Arias,* the rule could not impute the drug agents' knowledge to the patrolman *at all;* in that case, the precise timing of the agents' instruction relative to their development of reasonable suspicion

was irrelevant. Therefore, *Arias* is distinguishable from the present case because the drug agents specifically refused to inform the patrolman of their suspicions, and as such, he was not part of a coordinated investigation.

¶ 21 Accordingly, we hold that the fellow officer rule imputes information that the police possess as a whole to an individual officer who effects a search or arrest if (1) that officer acts pursuant to a coordinated investigation and (2) the police possess the information at the time of the search or arrest. Furthermore, the rule encompasses any information that the police gather between the initial assignment and the officer's ultimate action as part of a coordinated investigation.

¶ 22 Having established the proper scope of the fellow officer rule, we now turn to the case before us and determine whether the rule imputed sufficient information to Trooper Duncan to provide him with probable cause to order the blood draws.

### B. Application of the Fellow Officer Rule to This Case

¶ 23 Drawing blood from an unconscious party is a search that is "subject to the protections of the Fourth Amendment to the United States Constitution." *People v. Schall*, 59 P.3d 848, 851 (Colo.2002). In the motor vehicle context, the police infringe upon these protections if they draw blood from a non-consenting driver absent probable cause that he committed an alcohol-related driving offense. *Id.* To establish probable cause, the police need not possess absolute certainty of the driver's misconduct but must instead develop "that degree of certainty upon which reasonable and prudent people rely in making decisions in everyday life." *Id.* While certain facts may not establish probable cause in isolation, those same facts may support a finding of probable cause when considered in combination. *Id.* at 852.

¶ 24 In the instant case, Trooper Duncan—the officer who ultimately ordered the blood

draws—need not himself have possessed information amounting to probable cause in order to justify the search. Rather, if (1) Duncan acted pursuant to a coordinated investigation and (2) the police as a whole possessed information that amounted to probable cause at the time of the search, then the fellow officer rule imputed that probable cause to Trooper Duncan.

¶ 25 Here, although Trooper Duncan performed his duties in a different location from Troopers Benavides and Waters, Corporal Riley assigned Trooper Duncan the task of traveling to the hospital where Grassi was being treated and obtaining a blood draw if he determined "that alcohol was involved." In performing this assignment, Trooper Duncan joined the police's ongoing coordinated investigation, thus satisfying the first prong of the fellow officer rule. The issue, then, is whether the police as a whole possessed probable cause to believe that Grassi had committed an alcohol-related offense when the phlebotomist drew Grassi's blood (on Trooper Duncan' s orders) at 7:12 a.m.

¶ 26 Because Troopers Benavides, Waters, and Duncan were jointly engaged in a coordinated investigation, we must consider their observations collectively. Trooper Benavides testified that the weather was clear, that the vehicle had imprinted no skid or yaw marks, and that he could locate no external explanation for the crash, as "[i]t looked like the car just ran off the right side of the roadway." Trooper Waters similarly testified that, based on his preliminary observations of the crash site, no "mechanical defects or failures ... could have contributed to or ... caused the crash." Moreover, shortly after arriving on the scene, Trooper Waters deduced that Grassi had simply followed the fog line off of the roadway, and he testified that "[i]ntoxicated drivers have a propensity to follow the fog line." Crucially, both officers completed their observations prior to the first blood draw, meaning those findings are imputed to Trooper Duncan through the fellow officer rule.[8] Finally, Trooper Duncan himself de-

---

8. At the evidentiary hearing, Grassi's counsel argued to the trial court that Trooper Waters, who arrived on the scene at 4:58 a.m., could not possibly have developed his findings by 7:12 a.m.

We disagree. Trooper Waters testified unequivocally that he developed his findings prior to the time of the blood draws, and Grassi's counsel did not challenge this testimony on cross-examina-

tected a strong odor of alcohol on Grassi's breath. These observations, when considered in their totality, substantiated the police's reasonable belief not only that Grassi's driving had caused the crash but that he was driving while under the influence of alcohol. Therefore, the police as a whole possessed "that degree of certainty" that constitutes probable cause to believe that Grassi had committed an alcohol-related offense at the time of the blood draws.

¶ 27 Grassi nevertheless argues that our decisions in *People v. Roybal*, 655 P.2d 410 (Colo.1982), and *People v. Reynolds*, 895 P.2d 1059 (Colo.1995), compel us to conclude that the police in fact lacked probable cause. We disagree. In *Roybal*, the police discerned an odor of alcohol from the driver while investigating a motor vehicle collision. 655 P.2d at 411. Although the driver exhibited "none of the common indicia of intoxication in [his] speech, walk, and ability to understand," the police nevertheless detained him for further questioning. *Id.* at 411, 413. After concluding that the detention was an arrest, we determined that the odor of alcohol constituted "the single objective fact" suggestive of the driver's intoxication. *Id.* at 412–13. We thus held that the police lacked probable cause to arrest the driver, noting that "[a]n odor of alcoholic beverage is not inconsistent with [the] ability to operate a motor vehicle in compliance with Colorado law." *Id.* at 413. Specifically, we recognized that there exists "no case in which an odor of alcoholic beverage, *without more*, has been held to constitute probable cause to believe a person is under the influence of intoxicating liquor." *Id.* at 413 n. 8 (emphasis added).

¶ 28 *Reynolds* featured similar circumstances. In that case, following a single-car accident, the driver admitted to a police officer that he had consumed three beers more than six hours before the accident. 895 P.2d at 1060. The officer then ordered the driver's blood to be drawn without his consent. *Id.* We held that the police lacked probable cause to order the blood draw. *Id.* at 1062. In particular, we noted that the officer had

assumed that the driver was intoxicated "based solely on evidence that an accident had occurred in which [the driver] was involved and that [the driver] had admitted to drinking three beers some six to nine hours prior to the accident." *Id.* We acknowledged that such evidence may have been "sufficient to create a 'mere suspicion'" but concluded that it failed to meet the more stringent standard of probable cause. *Id.*

¶ 29 Both *Roybal* and *Reynolds* are inapposite to the present case. Together, they simply stand for the well-established proposition that an unexplained motor vehicle accident coupled with a single indicium of alcohol consumption (e.g., an odor of alcohol or an admission of having consumed alcohol well before the accident), absent additional evidence, does not constitute probable cause that a driver committed an alcohol-related offense. *See Reynolds*, 895 P.2d at 1062 ("To justify an internal search without consent or a warrant, there must be a 'clear indication' that the defendant was intoxicated. But here there was mere suspicion uncorroborated by any of the familiar signs of intoxication." (emphasis removed) (quoting *People v. Williams*, 192 Colo. 249, 258–59, 557 P.2d 399, 407 (1976))).

¶ 30 In this case, however, the police's collective observations went well beyond a "mere suspicion" that Grassi had been driving while intoxicated. Not only did Trooper Duncan detect a strong odor of alcohol on Grassi's breath, but Troopers Benavides and Waters both determined that Grassi's personal inability to safely operate his car and keep it on the road was the sole cause of the crash, having affirmatively ruled out any external factor such as mechanical failure or road obstruction. Indeed, Trooper Waters determined that Grassi behaved as intoxicated drivers typically do when he followed the fog line off of the roadway. *Cf. id.* ("There was no evidence offered that would rule out mechanical failure. In addition there were no facts to suggest that [the driver] was not forced off the road by circumstances beyond his control."). Thus, unlike in *Roybal*, where the record was "barren of evidence that the

---

tion. Therefore, the record reflects that Trooper Waters developed his initial findings prior to the

blood draws.

collision occurred as a result of misconduct by the defendant," 655 P.2d at 413, here Troopers Benavides and Waters possessed affirmative evidence that Grassi had been driving while intoxicated. Because the fellow officer rule imputed Trooper Benavides's and Trooper Waters's observations to Trooper Duncan, the police as a whole possessed "that degree of certainty" constituting probable cause to believe that Grassi had committed an alcohol-related offense at the time of the blood draws.

¶ 31 Accordingly, we hold that the fellow officer rule provided the police with probable cause to order the blood draws.

## IV. Conclusion

¶ 32 The fellow officer rule imputes information that the police possess as a whole to an individual officer who effects a search or arrest if (1) that officer acts pursuant to a coordinated investigation and (2) the police possess the information at the time of the search or arrest. In the instant case, the police as a whole, pursuant to a coordinated investigation, possessed probable cause to believe that Grassi had committed an alcohol-related offense at the time of the blood draws, and the fellow officer rule imputed that probable cause to Trooper Duncan, meaning no Fourth Amendment violation occurred. The judgment of the court of appeals is therefore affirmed.