Judge TAUBMAN dissenting.
¶ 47 Because I disagree with the majority that the legality of the initial contact between a driver and the police is not relevant in a civil driver's license revocation proceeding, I respectfully dissent. To the contrary, I would continue to follow Peterson v. Tipton, 833 P.2d 830 (Colo.App.1992), and its progeny, holding that because it is implicit in the statutory scheme, a driver may raise the legality of the initial traffic stop and subsequent arrest at his or her civil driver's license revocation proceeding.
¶ 48 Further, because this is the unusual case in which the officer who contacted petitioner, Tom Francen, did not have reasonable suspicion to stop his vehicle, I would affirm the rulings of the district court.
¶ 49 Following an adverse decision from an administrative hearing officer, Francen commenced this action in the district court seeking judicial review of the revocation order. He argued that the Department should have dismissed the revocation proceeding based on the lack of reasonable suspicion to support the initial stop of his vehicle.
¶ 50 The district court agreed, concluding that numerous Colorado appellate decisions have allowed drivers in revocation proceedings to challenge the initial stop by police *704 and that, in this case, "the initial stop of [Francen's] vehicle was unlawful under the reasonable suspicion standard."
¶ 51 The district court further concluded that the hearing officer erred in considering evidence of the roadside sobriety and breath tests derived from the unlawful stop, and that absent such evidence, the hearing officer's order was arbitrary and capricious because it was not supported by substantial evidence. Consequently, the court reversed the revocation order and remanded the matter to the Department for reinstatement of Francen's license.
I. Illegality of the Initial Stop as a Defense
¶ 52 Contrary to the majority's conclusion, I perceive no error in the district court's conclusion that under Colorado law, drivers facing administrative license revocation based on excessive BAC or refusal to submit to testing may raise as a defense alleged illegality of an initial motor vehicle stop by police. Although on appeal the respondent, Colorado Department of Revenue (Department), seeks to frame this argument in terms of whether applicable factors weigh in favor of applying the exclusionary rule in these administrative proceedings, I focus on the intent of the legislature concerning these proceedings as demonstrated in the revocation and express consent statutes.
¶ 53 One stated purpose of the revocation statute is to provide for highway safety by revoking the driver's licenses of persons shown to be safety hazards by driving with an excessive amount of alcohol or refusing to submit to testing as required under the express consent statute. See § 42-2-126(1)(a), C.R.S.2011. Another purpose of the revocation statute is to guard against the potential for erroneous deprivation of driving privileges by providing the opportunity for a full hearing. See § 42-2-126(1)(b), C.R.S.2011.
¶ 54 Section 42-4-1301.1(2)(a)(I), C.R.S.2011, part of Colorado's express consent statute, specifies that individuals who drive a motor vehicle in Colorado are
required to take and complete ... any test or tests of the person's breath or blood for the purpose of determining the alcoholic content ... when so requested and directed by a law enforcement officer having probable cause to believe that the person was driving a motor vehicle in violation of the prohibitions against DUI, DUI per se, DWAI, habitual user, or UDD.
(Emphasis added.)
¶ 55 This "probable cause" language first appeared in the express consent statute in 1989. See Ch. 363, sec. 6, § 42-4-1202(3)(a)(II), 1989 Colo. Sess. Laws 1615.
¶ 56 Prior to 1989, the applicable statutory language required drivers to submit to testing if "arrested" for a misdemeanor offense arising out of acts alleged to have been committed while driving under the influence, and provided that tests would be administered at the direction of the arresting officer having "reasonable grounds to believe" a person was driving under the influence. Under those comparable provisions, drivers were allowed to challenge the legality of the initial police contact or traffic stop in revocation proceedings. See Nefzger v. Colo. Dep't of Revenue, 739 P.2d 224, 229 (Colo.1987) (concluding that police had reasonable suspicion to support initial traffic stop of driver and thereby rejecting driver's contention that improper stop invalidated subsequent arrest and license revocation flowing from the stop); Wallace v. Dep't of Revenue, 787 P.2d 181, 182 (Colo.App.1989) (questions as to the legality of the initial traffic stop and subsequent arrest for driving under the influence are relevant issues in administrative revocation proceedings); Sanger v. Colo. Dep't of Revenue, 736 P.2d 431, 432 (Colo.App.1987) (disagreeing with Department's contention that reasonable suspicion to stop and probable cause to arrest were not an issue in revocation proceedings).
¶ 57 In 1992, the Peterson division held that "questions as to the legality of the initial motor vehicle stop and subsequent arrest for driving under the influence (DUI) may properly be raised as issues in driver's license revocation proceedings." Peterson, 833 P.2d at 831. The Peterson division noted that although its reliance on Wallace may have involved a previous version of section 42-2-122.1, its conclusion that a driver could challenge *705 the legality of the initial motor vehicle stop "remains unchanged by the subsequent amendments to the statute currently in effect and applicable to plaintiff's January 30, 1990 DUI arrest at issue here." Id. The division continued, "Even under the provisions of the express consent statute currently in effect, a police officer is not authorized to request and to direct an arrested driver to submit to alcohol testing absent 'probable cause' for the DUI arrest, and, by implication, absent reasonable suspicion for the initial stop." Id. (emphasis added).
¶ 58 Since Peterson was decided, other divisions of this court have explicitly or implicitly followed its rationale that the express consent statute's "probable cause" language allows drivers in revocation proceedings to challenge the legality of initial police contact. See Baldwin v. Huber, 223 P.3d 150, 152 (Colo.App.2009) ; Shafron v. Cooke, 190 P.3d 812, 814 (Colo.App.2008) ; Hampe v. Tipton, 899 P.2d 325, 329 (Colo.App.1995) ; see also Meyer v. State, 143 P.3d 1181, 1186 (Colo.App.2006) (ruling regarding probable cause or reasonable suspicion to detain driver in criminal proceeding is not binding on Department in revocation proceeding based on same incident).
¶ 59 I disagree strongly with the majority's conclusion that the Peterson division misread the 1989 amendments to the statute and therefore reached an erroneous conclusion because of its use of the phrase "arrested driver." In my view, the Peterson division used that term because the plaintiff in that case had been arrested and, indeed, in most cases, a driver subject to a civil driver's license revocation proceeding has been arrested. Thus, the Peterson division's reference to a police officer not being authorized to request and to direct "an arrested driver" to submit to alcohol testing absent probable cause "for the DUI arrest" was a shorthand way of referring to the statutory requirement in section 42-4-1301.1(2)(a)(I) that applies the express consent statute to "a law enforcement officer having probable cause to believe that the person was driving a motor vehicle in violation of" the prohibitions of various criminal statutes. Thus, the statute is based on the assumption that a police officer may not stop a driver for DUI or various related offenses without having probable cause to believe that the person was driving in violation of one of those criminal statutes.
¶ 60 Additionally, I would submit that if the Department or law enforcement officials believe that the Peterson division's interpretation was indeed based on a misreading of the statute, some efforts would have been made to prompt the General Assembly's amendment to the probable cause language in the express consent statute. However, that has not been the case, as far as I know.
¶ 61 Moreover, the General Assembly has amended the express consent statute ten times since Peterson was decided in 1992 without modifying the probable cause language the Peterson division relied on to conclude that drivers may challenge the initial police stop. Under these circumstances, we may presume the General Assembly has accepted and ratified Peterson 's interpretation of that language as including a requirement that officers have reasonable suspicion to initially stop a driver. See Silva v. People, 156 P.3d 1164, 1168 (Colo.2007) (by virtue of amending previously construed statute without changing portion that was judicially construed, legislature is presumed to have accepted and ratified prior judicial construction); see also Bd. of Cnty. Comm'rs v. Colo. Pub. Utils. Comm'n, 157 P.3d 1083, 1089 (Colo.2007) (legislative failure to change court's interpretation of statute is presumed to be ratification of that interpretation).
¶ 62 Indeed, in my view, this presumption is even stronger, given the General Assembly's failure to amend the statute in recent years. After Judge Furman expressly disagreed with the Peterson analysis in his special concurrence in Baldwin, 223 P.3d at 154, in 2009, a division of this court, relying on Judge Furman's special concurrence, then observed that the requirement for reasonable suspicion in a civil driver's license revocation proceeding was "an open question." See Fallon v. Colo. Dep't of Revenue, 250 P.3d 691, 695 (Colo.App.2010). Notwithstanding these opinions, the General Assembly did not amend the express consent statute.
*706 ¶ 63 Although the majority asserts that there is no evidence that the Peterson decision was brought to the attention of the General Assembly, the above presumption does not contain such a requirement. Further, one would think that the Baldwin and Fallon decisions would make it more clear to the General Assembly that a statutory change was warranted if the General Assembly in fact disagreed with the Peterson decision.
¶ 64 I further note that when the "probable cause" requirement for testing first appeared it 1989, it was contained within the statute addressing criminal misdemeanor driving under the influence. See Ch. 363, sec. 1, § 42-4-1202, 1989 Colo. Sess. Laws 1612. Given this context, it is unreasonable to presume that, in requiring officers to have probable cause to believe a DUI-related violation had occurred before they could request a test, the General Assembly intended to allow that probable cause to be established through the fruits of an illegal stop. See People v. Krueger, 208 Ill.App.3d 897, 153 Ill.Dec. 759, 567 N.E.2d 717, 722 (1991) (based on statutory requirements of an "arrest" and "reasonable grounds" that officers believed person was driving under the influence, court was unwilling to conclude that legislature intended to authorize suspension of drivers' licenses based on fruits of illegal arrests); Pooler v. Motor Vehicles Div., 306 Or. 47, 755 P.2d 701, 703 (1988) (concluding that by using term "arrest" as prerequisite for testing, legislature must have intended a valid arrest, and declining to attribute legislative intent to approve unconstitutional actions by police to stop drivers randomly without probable cause or reasonable suspicion); State v. Lussier, 171 Vt. 19, 757 A.2d 1017, 1020 (2000) (in permitting motorists in civil suspension proceedings to dispute whether processing officer had "reasonable grounds" to believe motorist was driving while intoxicated, legislature assumed that constitutional stop would be necessary predicate to finding reasonable grounds for suspicion of DUI).
¶ 65 The Department cites language in part of the current misdemeanor DUI statute addressing preliminary screening tests which requires officers to have made "lawful contact" with the driver. See § 42-4-1301(6)(i)(I), C.R.S.2011. The Department notes that, in contrast, section 42-4-1301.1(2)(a)(I) does not contain similar language. However, this provision in the DUI statute addressing preliminary screening, including the "lawful contact" language, was part of the very same 1989 amendment that added the "probable cause" language to what eventually became section 42-4-1301.1(2)(a)(I). Indeed, they were originally part of the very same criminal statute, see Ch. 363, secs. 5-6, § 42-4-1202(2.5), (3)(a)(II), 1989 Colo. Sess. Laws 1614-15, and were later separated in 2002 through a nonsubstantive recodification. See Ch. 342, sec. 3, § 42-4-1301.1, 2002 Colo. Sess. Laws 1907.
¶ 66 Reading these simultaneously enacted "lawful contact" and "probable cause" provisions together only lends further support to my view that the General Assembly intended the probable cause requirement for testing to include reasonable suspicion for the initial stop. Indeed, it would make little sense to read these provisions as requiring lawful initial contact by officers seeking to conduct a preliminary screening test which, in turn, could be used to establish probable cause, but not requiring any lawful initial police contact in the vast majority of other scenarios in which probable cause is sought to be established. See Suncor Energy (USA), Inc. v. Aspen Petroleum Prods., Inc., 178 P.3d 1263, 1266 (Colo.App.2007) (courts must presume that General Assembly intends just and reasonable result when it enacts a statute).
¶ 67 Further, while I appreciate the majority's thorough plain language analysis, and I am normally an adherent of the plain language approach, see, e.g., Yadon v. Southward, 64 P.3d 909, 914 (Colo.App.2002) (Taubman, J., dissenting), I disagree with its application here. In numerous instances, Colorado's appellate courts have discerned the General Assembly's intent to include provisions that were implicit, rather than explicit, in a statute. See, e.g., Atl. Richfield Co. v. Dist. Court, 794 P.2d 253, 259 (Colo.1990) (statutory scheme implicitly authorized district court to remand case to public utilities commission); People v. Vigil, 729 P.2d 360, 365 (Colo.1986) (implicit in statutory language *707 was premise that peace officers may not go outside territorial boundaries of their authority to arrest suspects except in limited circumstances described); People in Interest of M.M., 726 P.2d 1108, 1122 (Colo.1986) (statutory scheme implicitly required trial court to consider and eliminate less drastic alternatives before entering order termination parent-child legal relationship); Bd. of Cnty. Comm'rs v. Kraft Bldg. Contractors, 122 P.3d 1019, 1023 (Colo.App.2005) (implicit in statute and rule providing for award of "reasonable" attorney fees was requirement on part of party seeking fees to mitigate those fees); Krupp v. Breckenridge Sanitation Dist., 1 P.3d 178, 183 (Colo.App.1999) (statute authorizing special districts to charge fees for services furnished implicitly required those fees to be reasonable in light of services actually furnished), aff'd, 19 P.3d 687 (Colo.2001) ; Sigman Meat Co. v. Indus. Claim Appeals Office, 761 P.2d 265, 266 (Colo.App.1988) (statute implicitly allowed reimbursement for transportation expenses incurred in obtaining medical treatment).
¶ 68 Accordingly, I conclude that divisions of this court have properly interpreted the statutes at issue to include the implicit requirement that there be reasonable suspicion for a police officer's initial stop in a civil driver's license revocation proceeding.
¶ 69 In sum, I agree with Peterson 's holding and rationale. In requiring that officers have probable cause of a DUI or similar offense before they can request and direct a driver to submit to testing, the General Assembly intended that officers must also have reasonable suspicion to support the initial stop. By including this probable cause language in the express consent statute, and by implicitly ratifying Peterson and cases following it, I conclude that the General Assembly intended to allow drivers to challenge the legality of initial police contact in revocation proceedings.
¶ 70 In light of this conclusion, I do not address whether the exclusionary rule should otherwise apply in driver's license revocation proceedings under Ahart v. Colorado Department of Corrections, 964 P.2d 517 (Colo.1998).[9]
II. Stop of Francen's Vehicle
¶ 71 The Department contends, in the alternative, that if Francen is entitled to raise the illegality of the vehicle stop as a defense, Officer Schmidt's stop of Francen was lawful. Again, I disagree.
¶ 72 To justify an investigatory stop, police must have a reasonable articulable suspicion that the individual is involved in criminal activity. See People v. Martinez, 200 P.3d 1053, 1057 (Colo.2009). A police officer may stop a motorist to investigate his or her driving behavior when the officer has a reasonable suspicion that the driver has committed a traffic violation. See Nefzger, 739 P.2d at 229 ; Baldwin, 223 P.3d at 152 ; see also People v. H.J., 931 P.2d 1177, 1181 (Colo.1997) (to conduct traffic stop, officer must have reasonable suspicion that driver is violating law).
¶ 73 The reasonable suspicion inquiry is objective and must be viewed in light of the facts and circumstances known to the officer immediately before the stop. People v. Arias, 159 P.3d 134, 138 (Colo.2007). An officer's general suspicion or hunch of criminal activity is insufficient to support an investigatory stop. See People v. Revoal, 2012 CO 8, ¶ 11, 269 P.3d 1238, 1241 ; Arias, 159 P.3d at 138.
¶ 74 Here, the hearing officer found that Officer Schmidt contacted Francen "based upon the passenger exiting the vehicle at a stop light and approaching another vehicle next to them." The hearing officer further found "[t]here was no suggestion of any criminal activity which took place during this encounter."
¶ 75 These findings are supported by substantial evidence in the record. At the hearing, Officer Schmidt did not indicate that he observed Francen or the passenger commit a traffic violation, or that he even suspected such a violation. He further acknowledged that he did not observe any illicit activity, *708 that there was nothing criminal about someone getting out of a vehicle and then getting back in, and that nothing about the passenger's actions presented any evidence of criminal activity. Officer Schmidt conceded that the only reason he stopped Francen was that he wanted to know why the passenger got out of the vehicle and approached the other driver. He testified that he was "just suspicious that [someone would] get out of a car at 2:00 in the morning."
¶ 76 This type of general suspicion by an officer is insufficient to constitute reasonable suspicion. See Revoal, ¶ 11, 269 P.3d at 1241 ; Arias, 159 P.3d at 138 ; see also People v. Greer, 860 P.2d 528, 530-31 (Colo.1993) (general unarticulated hunch that criminal act has occurred is insufficient to support investigatory stop).
¶ 77 Noting that an officer's subjective beliefs are not controlling, the Department, nevertheless, contends that the stop was valid because Officer Schmidt observed facts creating an objective reasonable suspicion that Francen or his passenger committed three separate traffic infractions. I am not persuaded.
¶ 78 The Department first contends that Francen and his passenger violated section 42-4-805(7), C.R.S.2011, which provides that "[p]edestrians shall only be picked up where there is adequate road space for vehicles to pull off and not endanger and impede the flow of traffic."
¶ 79 The word "pedestrians" is not defined in the statute. However, the commonly understood meaning of a pedestrian is "a person who travels on foot" or "one walking as distinguished from one traveling by car or cycle." Webster's Third New International Dictionary 1664 (2002).
¶ 80 During the hearing, Officer Schmidt conceded that the passenger was outside of Francen's vehicle for fifteen to twenty seconds and then immediately re-entered the vehicle. Because the passenger had clearly been traveling by vehicle up to that point, and because he exited the vehicle only momentarily to speak with the driver of another vehicle, I am not persuaded he became a person traveling on foot and, thus, a "pedestrian" under section 42-4-805(7). Nor am I persuaded by the Department's assertion that Officer Schmidt observed violations of subsections (2) and (3) of section 42-4-805, C.R.S.2011. Those subsections respectively make it unlawful for a person to "stand in a roadway for purposes of soliciting a ride" and for a person under the influence of alcohol, a controlled substance, or a stupefying drug "to walk or be upon that portion of any highway normally used by moving motor vehicle traffic."
¶ 81 Here, nothing in Officer Schmidt's testimony or written report indicates any suspicion that Francen's passenger was soliciting a ride, or that he was under the influence of alcohol or any drug.
¶ 82 Based on the hearing officer's findings and the undisputed evidence in the record, I agree with the district court's conclusion that Officer Schmidt lacked reasonable suspicion to support the stop of Francen's vehicle. Because evidence of Francen's intoxication was obtained through the unlawful traffic stop, the hearing officer should not have considered it. Moreover, absent that evidence, the revocation order was arbitrary and capricious based on a lack of substantial supporting evidence. See Baldwin, 223 P.3d at 152 (a hearing officer's decision is arbitrary and capricious if a reviewing court is convinced that there was not substantial evidence to support the decision).
¶ 83 I would accordingly affirm the district court's judgment reversing the revocation of Francen's driver's license.

For the same reason, I do not discuss the Department's reliance on Judge Furman's special concurrence in Baldwin, 223 P.3d at 154.